**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**MILLARD METAL SERVICE CENTER,
INC., Respondent.**

No. 72-1255.

United States Court of Appeals,
First Circuit.

Heard Dec. 5, 1972.

Decided Jan. 22, 1973.

Howard Jay Kaufman, Atty., New York City, with whom Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Abigail Cooley Baskir, Washington, D. C., and David Miller, Attys., were on brief, for petitioner.

Henry G. Stewart, Boston, Mass., with whom William T. Sherry, Jr., and Nutter, McClennen & Fish, Boston, Mass., were on brief, for respondent.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

McENTEE, Circuit Judge.

In this proceeding the Labor Board seeks enforcement of an unfair labor

practice order issued against Millard Metal Service Center, Inc., a corporation engaged in the sale and distribution of brass and related products in Braintree, Massachusetts. This order is based on a Board finding that Millard (the company) violated § 8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with the union,[1] as the certified representative of its employees in an appropriate unit.[2]

On July 12, 1971,[3] the Board conducted a consent representation election. Of the twenty-seven eligible voters, eighteen voted for and eight voted against the union. One ballot was challenged. The company challenged the validity of the election and filed timely objection with the Regional Director to the certification of the union. In particular, it charged that the union had misrepresented to the company's employees the wage rates in effect at plants of other employers with whom the union had contracts. The company also charged that the timing of this misrepresentation made by letter dated July 9 made it impossible for it to rebut or otherwise dissipate the effect of the misrepresentation.[4] On the basis of these allegations the company requested that the election be set aside.

Pursuant to the Board's rules and regulations, the Regional Director investigated the company's objection and afforded it an opportunity to present evidence in support of it. In his report, the Regional Director recommended that the objection be overruled and that the union be certified as the exclusive bargaining agent in the unit. The Board denied the company's exceptions to this ruling and adopted the Regional Director's findings, conclusions, and recommendations. Shortly thereafter, the union requested a meeting with the company for the purpose of collective bargaining. The company advised the union that for the reasons above stated it was contesting the certification and would not bargain with it. This gave rise to the instant unfair labor practice charges which the company denied. Since the company raised no new issues and offered no newly discovered evidence, the Board granted the General Counsel's motion for summary judgment[5] and issued an order directing the company to cease and desist from its refusal to bargain with the union.

The entire basis for the company's objection to the union's certification is found in the union's letter dated July 9. This letter contained a detailed discussion of the various fringe benefits offered by the union and also set forth a comparison of the wages being paid by the company and by an organized alleged competitor. It stated, in relevant part, that:

"another metal warehouse with whom we have a collective bargaining Agreement is presently paying its warehousemen and drivers much more.

| Per hour | 5/1/71 | 5/1/72 |
|---|---|---|
| Drivers | 5.26 | 5.86 |
| Warehousemen | 3.98 | 4.43 |

Millard's drivers are paid $4.25 per hour. Millard's warehousemen are paid ? per hour (Millard hasn't published warehouse rates yet. Why?)."

The letter did not name the other warehouse, but, during his investigation, the

1. Excavating and Building Material Local 379 a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. It was stipulated that the appropriate unit consisted of all full time and regular part time truck drivers and warehousemen of the company at its Braintree location.

3. Unless otherwise indicated, all dates mentioned herein refer to the year 1971.

4. Friday, July 9, was the last work day before the election and the letter was mailed to the employees at their homes. The company states that it did not see copies of the letter until after the election.

5. The company argues that the granting of this motion deprived it of its right to an evidentiary hearing before the Board. In light of our disposition of this matter, we need not reach this issue.

Regional Director found that the alleged competitor was Industrial Service Center, Inc. of Cambridge, Massachusetts, and that the rates mentioned in the letter were taken from and accurately represented those in the agreement between Industrial and the union.[6] The company responds that the letter was accurate only in a limited sense, and gave a substantially incorrect picture. Specifically, in giving the competitor's wage rate for warehousemen, the letter quoted only one rate, that for special highly skilled warehousemen, with no indication of the fact that there were two rates, or quoting the regular rate.

In point of fact, as the company demonstrated and the Regional Director found only three of its twenty warehousemen were sufficiently skilled so as to be qualified to receive the pay rates set forth in the letter. Thus, the company argued that the letter presented an unwarranted wage differential of approximately forty-two cents [7] an hour to the great majority of its employees since, even if they had been working under the Industrial agreement, they would have fallen into lesser skilled categories and would not have been entitled to receive the wages quoted. In addition, the company contended, *inter alia*, that the letter did not provide an adequate basis by which the employees could evaluate the union's representations because the alleged competitor was not named.

In denying these objections, the Regional Director found that "[t]he previous campaign references to wages and companies, when considered together with (the union's) letter objected to, were sufficiently explicit to give the electorate a fair opportunity to appraise the wage issue and to vote their preference concerning representation." He concluded that the "letter objected to accurately reflects the Industrial rates and that in all of the circumstances of this case, the alleged misrepresentations, if any, by the union are not so substantial as to be reasonably expected to have had a significant impact upon the election which the union won by an over 2–1 margin."

■■ As we have recently had occasion to observe,

"Representative elections, challenged because of asserted pre-election misrepresentations, will not be lightly set aside. A certain degree of inaccuracy and ambiguity is recognized as indigenous to campaign propaganda. In order to warrant the setting aside of a representative election on this ground 'the burden is on the objector . . . to show it was 'sufficiently likely' that the employees were misled so 'that it

---

6. Article XV of the Industrial agreement provides as follows:

| | Effective 6-29-70 | Effective 1-4-71 | Effective 1-3-72 |
|---|---|---|---|
| LABOR GRADE 1 ......................... | 2.90— | 3.15— | 3.40— |
| [probationary employees, etc.] .............. | 3.18 | 3.43 | 3.68 |
| LABOR GRADE 2 ......................... | 3.20— | 3.45— | 3.70— |
| [warehouseman B, shear helper, machine operator C, maintenance] | 3.48 | 3.78 | 3.98 |
| LABOR GRADE 3 ......................... | 3.50— | 3.75— | 4.00— |
| [warehouseman A, shearman ................ No. 2, machine operator B, clerk] | 3.73 | 3.98 | 4.23 |
| LABOR GRADE 4 ......................... | 3.75— | 4.00— | 4.25— |
| [shearman No. 1, machine operator A, stacker crane operator, inventory clerk] | 3.93 | 4.18 | 4.43 |

---

7. The company represented that the average hourly rate for its warehouse employees was $3.56, which is forty-two cents less than the rate quoted in the letter as being currently in effect. This rate is, incidently, competitive with the pay scale contained in Labor Grades 1 and 2 of the Industrial contract.

cannot be told whether they were or were not.' Baumritter Corp. v. N.L.R.B., 386 F.2d 117, 120 (1st Cir. 1967); N.L.R.B. v. Trancoa Chemical Corp., 303 F.2d 456, 461, (1st Cir. 1962). Since, in the first instance, this determination rests within the broad discretion of the Board, the Board's determination is to be set aside only for an abuse of discretion. (Citations omitted.)

"The Board will set aside an election 'only where there has been a misrepresentation . . . which involves a substantial departure from the truth, at a time which prevents · the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election.' Hollywood Ceramics Co., Inc., 140 NLRB 221, 224 (1962). All of these elements must be present before an election will be set aside. *See*, N.L.R.B. v. Cactus Drilling Corp., 455 F.2d 871, (5th Cir. 1972). . . . Misrepresentations have an insignificant impact when

> (1) the employees possess independent knowledge with which they can evaluate the statements, *Hollywood Ceramics, supra; see also,* N.L.R.B. v. Maine Sugar Industries, Inc., 425 F.2d 942, 945 (1st Cir. 1970), or

> (2) the employees have no reason to believe that the speaker had any special knowledge on which they should rely. N.L.R.B. v. A. G. Pollard Co., 393 F.2d 239, 242 (1st Cir. 1968); N.L.R.B. v. Southern Foods, Inc., 434 F.2d 717, 720 (5th Cir. 1970)."

N.L.R.B. v. O. S. Walker Company, Inc., 469 F.2d 813 (1st Cir. 1972).

We do not depart from these criteria. We find, however, in applying them to the facts of the instant case, that the Board's order must be vacated and the certification set aside.

Because of the rather complicated findings of the Regional Director, including the reference to "alleged misrepresentations, if any," it is not clear whether he made a finding that forty-two cents an hour was an insubstantial misrepresentation. We believe that it cannot be gainsaid that a wage distortion of this magnitude constitutes a substantial misrepresentation likely to have a significant impact on an election. Wage rates are, of course, issues of particular sensitivity to employees. Collins & Aikman Corp. v. N.L.R.B., 383 F.2d 722, 728 (4th Cir. 1967); N.L.R.B. v. Houston Chronicle Publishing Co., 300 F.2d 273, 280 (5th Cir. 1962). The fact that the rates set forth in the letter may have been accurate with regard to some of Industrial's employees [8] and were accurate as to three of the company's warehousemen will not avail the Board since the rates cited presented a distorted picture to at least seventeen of the voters in the unit. *See* Grede Foundries, Inc., 153 N.L.R.B. 984 (1965). In addition, it is undisputed that the company did not have an opportunity to make an effective reply to the union's representations. The mailing of this letter was timed in such a manner that the company did not obtain a copy of it until after the election was over. Finally, it is apparent that the data found in the letter—wage levels in one of the union's collective bargaining agreements—is information of the type about which the employees might reasonably expect the union to have special knowledge. *See* Collins & Aikman Corp. v. NLRB, *supra,* 383 F.2d at 727. This last is just the opposite of *Walker,* where the representation was as to the company's own contract—to which the employees were parties, and the union was not.

Turning now to the Regional Director's finding that "[t]he previous campaign references to wages and companies . . . were sufficiently explicit to give the electorate a fair oppor-

---

8. The Regional Director made no finding as to how many, if any, of Industrial's warehouse employees were in fact being paid under the rates set forth in the letter in question.

tunity to appraise the wage issue," we note initially that we are not favorably disposed toward a rule which permits a party to circulate misleading campaign propaganda and then escape harmless on the ground that the deceived employees had an adequate opportunity to investigate and to discover the truth. As we said in Cross Baking Company v. NLRB, 453 F.2d 1346, 1349 (1st Cir. 1971), "[t]o excuse a flat misrepresentation on the ground that the deceived party, having no reason to do so, could have investigated and learned the truth is contrary to both legal and ethical principles." Particularly where the misrepresentation is deliberate, this is an excuse that should be available only when it is clearly apparent that the employees could not be expected to be deceived. The facts here are just the reverse of that. The Board's brief handles *Cross Baking Company* by omitting all reference to it.

We note at the outset, that although on other occasions the union gave the name of the employer whose good record it was pointing to, in this instance it made it additionally difficult for an inquiring employee, assuming there were such, to check, by omitting the name and saying simply "another metal warehouse with whom we have an . . . agreement." More fundamentally there was an insufficient basis in the record to support the Regional Director's finding that the employees were sophisticated with regard to the wages earned by warehousemen at Industrial. Prior to the July 9 letter, the union sent a letter dated July 1 to the employees which raised the issue of truck drivers' wages. It stated in part: "Do you drive a truck

at Milard [sic]. Ask the drivers of Brown, Wales Industrial and Ryerson what their wage rate is. Is your employer being fair with you? Compare your wages for warehouse work with the wages paid by other steel houses organized by 379." In a second letter the union listed the fringe benefits provided in its agreement with Industrial, but made no mention of wage rates for warehousemen. These two references, one of which merely adverted to the issue of rates of pay for warehouse employees, were not sufficient in themselves to warrant a finding that the company's employees were knowledgeable enough to evaluate the subtle misrepresentations presented by the July 9 letter.[9] In addition, the fact that the letter was mailed out on the last working day before the election, thereby curtailing the employees' opportunity to investigate the union's representations, does not further the Board's cause. *See* Hollywood Ceramics Co., 140 N.L.R.B. 221, 225 (1962). As we said in *Cross Baking, supra,* 453 F.2d at 1350, "[e]leventh hour misrepresentations, manifestly deliberately untrue, have obviously been carefully timed to obtain the utmost benefit of the untruth, and presumably have been phrased to go just far enough to meet what the misrepresenting party believes to be necessary." Considering all of the circumstances detailed above and, in particular, the amount of the wage distortion, we find that the union's letter of July 9 went too far in presenting misleading campaign propaganda and that the election must be set aside.

*The Board's order will not be enforced.*

9. Nor are we persuaded by the Board's argument that because Millard's "employees are themselves subject to job classifications similar to those in effect at Industrial, and therefore presumably well acquainted with the longevity and skill requirements for each classification and level thereof, it can safely be assumed . . . that they did not infer from the Union's letter that all of the 'competitor' compa-

ny's employees were being paid at the same high rate." Before the Regional Director the company argued that it was not a competitor of Industrial, that its product line only overlapped that of Industrial by 10%, and that it was generally a smaller and less sophisticated operator. The Regional Director did not in fact find that Millard and Industrial were competitors.