**HARLAN #4 COAL COMPANY, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 72–1997.**

United States Court of Appeals, Sixth Circuit.

Argued June 9, 1973.

Decided Jan. 10, 1974.

John E. Jenkins, Jr., Jenkins, Schaub & Fenstermaker, Huntington, W. Va., on brief for petitioner.

Fredric Sagan, N. L. R. B. for respondent; Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Asst. Gen. Counsel, Attys., N. L. R. B., Washington, D. C., on brief.

Before WEICK, EDWARDS and Mc-CREE, Circuit Judges.

McCREE, Circuit Judge.

This petition for review of an order of the National Labor Relations Board by the Harlan #4 Coal Company and the cross-application for its enforcement by the Board require us to determine whether there is substantial evidence on the record as a whole to support the Board's determination that the company's refusal to bargain with its employees' certified bargaining agent was an unfair labor practice in violation of sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), (1).[1] We hold that there is.

The events culminating in this appeal began over three years ago on May 28, 1970, when a majority of the employees of the Harlan #4 Coal Company (the company) voted against having the United Mine Workers of America (the union) act as their exclusive bargaining representative. The union filed with the National Labor Relations Board timely objections to the election alleging that the company's improper conduct during the election campaign invalidated the result. On February 23, 1971, a hearing officer found that the company had engaged in improper conduct and recommended that the election be set aside. This determination was affirmed by the Board's Regional Director and a second election was directed. The company's request for review by the Board was denied because there were no substantial issues warranting review.

On May 5, 1971, the company filed a motion requesting that a new bargaining unit or different bargaining units be determined in light of changed conditions and circumstances including the closing of one mine and the opening of another. The Regional Director stayed the second election and ordered a hearing to determine the appropriate bargaining unit. On August 5, 1971, the Regional Director issued an order in which he redefined the appropriate bargaining unit to include all production and maintenance employees working in and around the coal mines of the company and its K.O.K. No. 1, K.O.K. No. 2 and K.O.K. No. 3 division mines. The company did not file a request for review of this redefinition of the unit prior to the second election.

On September 23, 1971, a majority of the company's employees voted for the union.[2] Shortly thereafter, the company filed four objections to the election contending that: (1) union representatives stationed themselves adjacent to the voting area and gave company employees the impression of surveillance and "checking off"; (2) on the eve of the election the union president sent to company employees a letter containing a material misrepresentation to which the company had no opportunity to respond; (3) the union disseminated false information that the company had coerced and intimidated its employees; and (4) the provision on the election ballot for a "neither" vote to be checked if an employee wanted neither of the two unions participating in the election to represent him was misleading.[3]

The Regional Director, in a supplemental Decision and Certification of Representation determined that the company's objections were without merit and, on November 15, 1971, certified the United Mine Workers as the exclusive bargaining agent of the company's employees. The company's request for re-

1. Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed by section 157 of this title." Section 157 of title 29 provides in relevant part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157.

2. The results of the election were 43 votes for the United Mine Workers, 1 vote for the Intervenor Southern Labor Union, 16 votes against both unions, and 9 challenged ballots.

3. The Southern Labor Union was permitted to intervene and have its name placed on the ballot.

view of the certification by the Board was denied on February 2, 1972, because it failed to raise substantial questions warranting review.

Meanwhile, on November 29, 1971, the union had requested the company to bargain. On December 10, the company's president informed the union that a request for review of the Regional Director's decision was pending and that the union should call back after the disposition of that request. On December 14, 1971, and again on February 4, 1972, two days after the Board had refused the requested review, the union requested the company to bargain. These requests were refused.

On February 22, 1972, the union filed with the Board an unfair labor practice charge that the company had refused to bargain with it even though it had been properly certified as the exclusive bargaining agent. On March 29, the General Counsel to the Board issued a complaint and notice of hearing against the company. On April 6, the company answered that it had not refused to bargain and that the election had been conducted in an inappropriate unit. On June 8, the General Counsel filed with the Board a motion for summary judgment against the company. Five days later, the Board issued an order transferring the proceedings to it, and a notice to show cause why the motion should not be granted. On June 23, the company filed a memorandum in opposition to the General Counsel's motion. The Board held that the issues raised by the company in opposition to the motion either had been or could have been litigated in the prior representation proceeding and therefore could not be relitigated in the unfair labor practice proceeding in the absence of newly discovered or previously unavailable evidence. Accordingly, it granted the motion for summary judgment. In its Decision and Order issued on September 18, 1972, 199 NLRB No. 15, the Board found that the company's refusal to bargain with the union violated sections 8(a)(5) and (1) of the National Labor Relations Act, re-

affirmed the certification of the United Mine Workers, and required the company to bargain with it upon request and to post appropriate notices.

In this appeal from that order, the company argues that its refusal to bargain did not constitute an unfair labor practice because the election of September 23, 1971, should have been set aside for two reasons. First, the Regional Director should have held a hearing to determine whether union representatives improperly maintained surveillance of and checked off company employees. Second, the letter sent by the union president to company employees on the eve of the election contained a material misrepresentation to which the company had no opportunity to respond thereby destroying the "laboratory conditions" necessary to a valid election.

■ In reviewing the decision of the Labor Board, we observe that Congress has entrusted to the Board considerable latitude in resolving disputes concerning representation, and that our task is to determine whether the Board has acted arbitrarily in the exercise of its "wide degree of discretion." *E. g.,* NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946); NLRB v. Tennessee Packers, Inc., Frosty Morn Division, 379 F.2d 172, 180 (6th Cir. 1967) cert. denied, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364. We also observe that a party objecting to the validity of an election on the grounds of improper pre-election conduct must shoulder a heavy burden of proof to demonstrate by specific evidence that the election was unfair. *E. g.,* NLRB v. Mattison Machine Works, 365 U.S. 123, 124, 81 S.Ct. 434, 5 L.Ed. 2d 455 (1961); NLRB v. Dean Foods Co., 421 F.2d 664 (6th Cir. 1970) cert. denied, 398 U.S. 939, 90 S.Ct. 1843, 26 L.Ed.2d 271.

### UNION SURVEILLANCE

■ In support of its objection that the union engaged in improper surveillance of its employees, the company sub-

mitted only a single affidavit by its treasurer, Ralph Fortner, who stated:

As I left the voting place just before 8 o'clock, I noticed that Philpot and Hall, Petitioner representatives, went to an automobile which was parked about 20 feet from where the employees were lining up to vote. The headlights of that car pointed in the direction of the employees. The Petitioner representatives seated themselves inside the car in the front seat and were looking through the front windshield at the employees. I proceeded away from the area with other Employer representatives and walked down a railroad track about 400 to 500 feet. I was concerned as to whether the Petitioner representatives had left the voting area. I climbed up on a coal car and looked back and saw that the Petitioner representatives were still in the auto where I had previously seen them. This was at approximately 8:10 to 8:15 a. m. From the angle I was looking I could not see any of the voters and they could not see me. I believed by this time most of the employees at the mine had voted. The relationship of the Petitioner representatives to the line of voters was such as to give the clear impression that they had the voting line under surveillance and were checking off voters.

In response, union representatives who were near the polling place submitted affidavits in which they denied any improper conduct and disputed the allegations contained in the company affidavit:

Immediately prior to the opening of the polls we left the voting area and proceeded about 700 yards from the polling place and parked the car in which we were riding. We did not talk to anyone that voted during the period of time the polls were open and didn't recall that anyone that voted in the election passed our car. The men that voted were practically all at the polls when the polls opened.

The Regional Director declined to hold a hearing to determine whether the union had engaged in improper surveillance. In so doing he relied upon the Board's decisions in A. D. Julliard and Co., 110 N.L.R.B. 2197, 2199; Belk's Department Store of Savannah, Ga., Inc., 98 N.L.R.B. 280, 281; and International Stamping Co., Inc., 97 N.L.R.B. 921, 922, where the Board stated:

Although it is the policy of the Board to prohibit the keeping of any list, apart from the official voting list, of persons who have voted in a Board-directed election in the cases in which this prohibition was enunciated, it was either affirmatively shown or could be inferred from the circumstances, that the employees knew that their names were being recorded by the Employer. In the instant proceeding, there is no such affirmative evidence; nor may any such be inferred from the circumstances in the case. (Footnote omitted).

Observing that the party alleging the objectionable conduct has the duty to furnish evidence that affords a basis for setting aside an election, Felix Bonura Company, 119 N.L.R.B. 1620, and noting the absence of employee complaints of surveillance, the Regional Director found that the company had not adduced any evidence from which he could infer that union representatives either maintained a list of employees or that if such a list had been maintained that employees believed that their names were being recorded at the polling place.

We agree that the company's affidavit supported a finding only that union representatives were at or near the polling place. Presence alone, in the absence of evidence of coercion or other objectionable conduct, is insufficient to warrant setting aside an election. Choctaw Provision Company, Inc., 122 N.L.R.B. 474; Cooper Supply Company, 120 N.L.R.B. 1023; Houston Shell and Concrete Division, McDonough Company, 118 N.L.R.B. 1511. And since the company's affidavit, if accepted as true,

would not require setting aside the election, no evidentiary hearing was necessary. *E. g.*, NLRB v. Air Control Products of St. Petersburg, Inc., 335 F.2d 245, 249, 250 (5th Cir. 1964); *cf.* NLRB v. Tennessee Packers, Inc., Frosty Morn Division, supra.

## THE MATERIAL MISREPRESENTATION

The alleged material misrepresentation was contained in a letter sent by the United Mine Workers president to company employees on the eve of the election. This letter stated in relevant part:

Since the last election the company has been sold to U.S. Plywood-Champion Paper, Inc. This [is] one of the largest corporations in the world, and can easily pay the union scale. It is reported that they paid five million dollars to Bill Conley and his associates, including Frank Qualls. Don't be mis-led [sic] by them coming to you now and saying that they are unable to pay the contract. You are aware that your wages are frozen by the action of President Nixon, but if you vote for the United Mine Workers of America, you can get the union contract wages and other conditions. We urge you to think about this for the benefit of yourself and your family.

The company argues on this appeal that this letter deliberately misrepresented that if employees voted for the union they would receive automatically union scale wages [4] even though other persons' wages were frozen by order of the President. In support of its argument, the company submitted to the Regional Director eight identical employee affidavits which state in relevant part:

I was led to believe that if this union won the election, I would receive at once the present union contract wages and other benefits, although other

people's wages were frozen by President Nixon.

This letter did influence my vote and I make this statement on my own free will with no threats or promises from anyone.

In his decision, the Regional Director refused to accord any weight to these affidavits. Moreover, although he found that the letter "could be subject to the interpretation that if the employees vote for the petitioner, they would avoid the legal effect of the wage freeze," he refused to set aside the election on this ground. First, he explained, the employees were aware that no wage increase could be obtained unless the company agreed to it in negotiation with the union and the company had indicated to its employees several times that it would not agree to increased wages. Second, he took "official notice of the fact that the Federal Government has widely publicized the Wage and Price Freeze Program and publicized telephone numbers which citizens can call concerning questions as to the effect of the Wage Price Freeze on specific matters."

Both the failure of the Regional Director to give any weight to the eight identical employee affidavits executed after the election and his decision that the union letter did not constitute a material misrepresentation sufficient to warrant setting aside the election are urged as error before us.

■ We hold, however, that the Regional Director did not err in refusing to give weight to the eight identical employee affidavits and in finding that the letter did not constitute a material misrepresentation so as to warrant setting aside the election. In making this determination, we are mindful of the dangers of permitting otherwise valid elections conducted by secret ballot to be set aside because some voters, after post-election introspection and in response to inquiry by their employers, believe that their votes may have been improperly

4. The union scale wages referred to in the letter were apparently those provided in the National Bituminous Coal Wage Agreement which was to expire on September 30, 1971.

influenced or because we believe that campaign speeches may have an impermissible impact on employee free choice.[5]

Our disinclination to find that the Regional Director erred in not permitting statements of voter intention to impeach the validity of secret ballots is consistent with the holding in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). *But cf.* NLRB v. Donnelly Garment Co., 330 U.S. 219, 67 S.Ct. 756, 91 L.Ed. 854 (1947). In *Gissel* the Court, in considering whether the validity of union authorization cards could be impeached by testimony of the card signers about their subjective intent for signing the cards, accepted

the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of § 8(a)(1). We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry. *Id.* at 608, 89 S.Ct. at 1939. (Footnote omitted).

If union authorization cards, often signed in the presence of a union solicitor, may not be impeached by testimony concerning an employee's subjective motivation there is less reason to permit this evidence to impeach the more reliable evidence of an employee's intent—his secret ballot. Indeed, in *Gissel,* the Supreme Court "acknowledged [the] superiority of the election process" in referring to the Labor Board's policy "that secret elections are generally the most

satisfactory—indeed the preferred—method of ascertaining whether a union has majority support." *Id.* at 602, 89 S.Ct. at 1934.

Attempts to permit the introduction of such evidence have been spurned by courts before. In NLRB v. Clearfield Cheese Co., 322 F.2d 89 (3d Cir. 1963), for example, the court enforced a bargaining order of the Labor Board based upon findings that a speech and a letter from the employer to his employees conveying a threat that the employer would go out of business if the union prevailed in the election had robbed the employees of free choice. In finding that it was not permissible to allow employees to testify that their vote against the union had not been the result of employer coercion, the court explained:

Nor do we think that the Company's offer of proof in any particular demonstrates an area for factual inquiry demanding a formal hearing, or even that such a hearing, if had, would bear fruitful results. Indeed, the preferred testimony of some employees (who presumably would testify favorably for the Company) as to their understanding of the speech and letter does not begin to reach the substance of the matter. But such testimony would invite the further inquiry, in this instance, as to the direction of the witness-employees' thoughts on representation by the Union, or how he cast his vote: an inquiry destructive of the purpose of the secret ballot and creative of the spectre of post-election change of mind. *Id.* at 93–94.

Our approval of the Board's determination not to consider employee affidavits does not, however, preclude inquiry into whether the union's letter constitut-

---

5. The Board itself has based its findings concerning the impact of various campaign tactics largely on its own speculation and has never conducted an empirical study to determine the impact of various campaign techniques on voting behavior. Recently however, some empirical research has been conducted. The preliminary results of this research indicate that campaigns have little impact on voting behavior and that the impact they may have is often just the opposite of that which the Board has assumed they would have. See Getman & Goldberg, The Myth of Labor Board Expertise, 39 U. Chi.L.Rev. 681 (1972) ; Getman, Goldberg & Herman, The National Labor Relations Board Voting Study: A Preliminary Report, I J. Legal Studies 233 (1972).

ed a material misrepresentation in violation of the rule established by the Board in Hollywood Ceramics, 140 N.L.R.B. 221 and adopted by this court in NLRB v. Louisville Chair Co., 385 F.2d 922 (6th Cir. 1967) cert. denied 390 U.S. 1013, 88 S.Ct. 1264, 20 L.Ed.2d 163 (1968). In *Hollywood Ceramics,* where the Board sustained an employer's objection to an election because the union had, on the eve of the election, distributed misleading comparisons of wages and requisite skills in the employer's plant and in unionized plants, the Board articulated the following rules for determining when misrepresentation is sufficient to set aside an election:

> It is obvious that where employees cast their ballots upon the basis of a material misrepresentation, such vote cannot reflect their uninhibited desires, and they have not exercised the kind of choice envisaged by the Act. For this reason, *the Board has refused to certify election results where a party has misrepresented some material fact, within its special knowledge, so shortly before the election that the other party or parties do not have time to correct it, and the employees are not in a position to know the truth of the fact asserted.*

We believe that an election should be set aside only when there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election. However, the mere fact that a message is inartistically or vaguely worded and subject to different interpretations, will not suffice to establish such misrepresentations as would lead us to set the election aside. But even where a misrep-

resentation is shown to have been substantial, the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election. For example, . . . the Board may find that the employees possessed independent knowledge with which to evaluate the statements. 140 N.L.R.B. at 224.

■ In this case, there is no question that the challenged letter was sent to employees at a time that prevented the company from effectively replying to it. We believe, however, that the Board's finding that the company's attack failed on the other grounds necessary for setting aside an election is supported by substantial evidence considering the record as a whole. First, the letter was not susceptible only to the interpretation urged by the company but instead was ambiguous and subject to several interpretations. Therefore it was insufficient to serve as a basis for setting aside the election. *Hollywood Ceramics, supra.* Second, information about the wage freeze was not within the "special knowledge" of the union but was, on the contrary, readily available to employees.

We agree with the Regional Director that the letter is subject to the interpretation that if company employees voted for the union they would immediately obtain union scale wages. However, the letter is equally subject to the interpretation that the union could obtain for employees contract wages as soon as it was legal to do so—as soon as the freeze was ended. The letter is at worst delphic and inartistic. It may have been intended to persuade employees that a temporary wage freeze should not dissuade them from voting for the union.

■ Even if the letter is interpreted as the company would have us do,[6] the

6. After argument, the parties were asked to brief the question, "At the time of the disputed NLRB election in this case, did federal law and regulations provide for discretion in

the Pay Board to allow wage increases?" From their responses, it appears that the duration of "Phase 1" of the President's Economic Stabilization Program was too

Board did not err in concluding that the misrepresentation it conveyed did not have a real impact on the election. Information about the wage freeze was not within the special knowledge of the union. It had been widely publicized and debated. And, the federal government had established places where answers to specific questions about the freeze could be obtained. Moreover, the Regional Director found, and his finding is not unsupported, that the employees were aware that any increase in wages would have to be agreed upon by the company and that the company had stated several times that it would not agree to an increase. For all these reasons, the findings of the Board have evidentiary support and should not be set aside.

This case is not controlled by Radio Corporation of America, 102 N.L.R.B. 124 (1953), Seneca Knitting Mills, 59 N.L.R.B. 754 (1944), and Continental Oil Co., 58 N.L.R.B. 169 (1944), upon which the company relies. Each of those cases involved an election in which an insurgent union was seeking to unseat an incumbent union and just prior to the election either the company or the incumbent union announced that a contract previously negotiated between them had been approved by the Wage Stabilization Board, an agency authorized to regulate wage increases. These announcements were made by the Board to either the company or the incumbent union in violation of its own rules prohibiting such announcements during the pendency of a representation election. The Board found that this information, to which employees did not have ready access, would have the obvious effect of making employees believe that a vote for the incumbent union would insure the previously negotiated wage increases and that a vote for the insurgent union would nullify the approved contract and perhaps cause employees to lose the approved wage increase altogether.

Nor is this case similar to Cross Baking Co. v. NLRB, 453 F.2d 1346 (1st Cir. 1971), where the court set aside the Board's order to bargain because two days prior to the election, the union sent a letter to the employees that contained the misrepresentation that in another plant the union had obtained and the employees had received a wage increase of seventy-five cents per hour when in fact part of the increase had been obtained by another union and the employees had not yet received the entire increase. In that case, the information was within the special knowledge of the union, and the employer had no opportunity to respond to the letter. We also observe parenthetically that the union won the election in that case by one vote.

## CONCLUSION

This case requires us to determine whether on the record as a whole there is substantial evidence to support the Board's determination that the union did not improperly maintain surveillance of employees and that the letter sent by the union to employees was not a material misrepresentation that would require the election to be set aside. Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Cross Co. v. NLRB, 286 F.2d 799, 802, rehearing denied, 288 F.2d 188 (6th Cir. 1961). We observe that this standard of review was not "intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carrying the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would jus-

---

short to permit a definitive answer because although some wage increases were permitted, none under circumstances similar to those here was granted. We regard this ev-

idence as casting some doubt on the asserted falsity of the union's representation but in view of our disposition of the case, we find that this factor is not determinative.

**126**

tifiably have made a different choice had the matter been before it *de novo.*" 340 U.S. at 488, 71 S.Ct. at 465.

Our examination of the entire record discloses that there is no factual dispute that union representatives, although present during polling, did not engage in any other conduct that would be improper and that there is no dispute concerning the content of the letter sent by the union president to employees and the timing of its delivery. The inferences to be drawn from these facts, and from the widespread publicity accompanying the announcement and implementation of the wage freeze, the knowledge of the employees that no wage increase could be obtained without company agreement, and the company's statements that it would not agree to an increase, are matters peculiarly within the Labor Board's expertise. We therefore defer to it.

Review is denied and enforcement is granted.