NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SOUTHERN HEALTH CORP. d/b/a
Corydon Nursing Home, Respondent.

No. 73–2028.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1974.

Decided May 2, 1975.

Elliott Moore, Deputy Associate Gen. Counsel, Thomas Woodley and Alan D. Cirker, Attys., N. L. R. B., Washington, D. C., for petitioner.

Robert L. McLaughlin, Indianapolis, Ind., for respondent.

Before FAIRCHILD, Chief Judge, and PELL and TONE, Circuit Judges.

FAIRCHILD, Chief Judge.

The National Labor Relations Board found that Southern Health Corporation, operator of a nursing home at Corydon, Indiana, refused to bargain with its employees' certified bargaining agent in violation of Sections 8(a)(5) and (1) of the National Labor Relations Act (29 U.S.C. §§ 158(a)(5) and (a)(1)). The company concedes refusal to bargain but challenges the certification.

On May 19, 1972 a consent election was conducted by the Board. The vote was 12 to 9 in favor of the union, with two challenged ballots. On May 26 the company filed objections to certain pre-

election conduct of the union which al-. legedly affected the outcome of the bal-· loting. The Regional Director conducted an administrative investigation of the company's objections and made a report recommending that the objections be overruled. The Board, after considering the company's exceptions, adopted the Regional Director's recommendations and certified the union as exclusive bargaining agent. In the complaint proceeding, the general counsel moved for summary judgment on the pleadings, asserting that all matters presented by the company as justification of its refusal to bargain had been previously raised and rejected in the representation proceeding. In response, the company, for the first time, demanded a hearing with respect to the factual issues raised by its objections to the election. The Board granted summary judgment, concluding that "[a]ll issues raised by Respondent in this proceeding were or could have been litigated in the prior representation proceeding, and the Respondent does not offer to adduce at a hearing any newly discovered or previously unavailable evidence, nor does it allege that any special circumstances exist herein which would require the Board to reexamine the decision made in the representation proceeding." In resisting enforcement the company contends that in the representation proceeding the Board should have denied certification as a matter of law, or at least that the Board should have conducted a hearing into the company challenges.

## I.

■ It is well established that under the statutory scheme of the National Labor Relations Act, the Board is entrusted with the responsibility of conducting elections and of supervising the conduct and actions of the parties therein concerned to insure a free, unfettered exercise of self-determination. *See generally,* N.L.R.A. Part 9; N.L.R.B. v. A. J. Tower Co., 329 U.S. 324, 328, 67 S.Ct. 324, 91 L.Ed. 322 (1946). This function is essentially administrative in nature,

and the courts have, therefore, evidenced reluctance to interfere. "The conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse." N.L.R.B. v. Olson Bodies, Inc., 420 F.2d 1187, 1189 (2nd Cir. 1969), cert. denied, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971).

■ Considerable latitude must be given the Board where an election is challenged, even for substantial misrepresentations. N.L.R.B. v. Mar Salle, Inc., 138 U.S.App.D.C. 135, 425 F.2d 566, 570–571 (1970). The Act does not specifically require post-election examination of such matters. Rather, the Board, as an administrative decision designed to effectuate its primary task of insuring an acceptable democratic labor election process, has determined that flagrant and substantial pre-election misconduct may so impair the integrity of the ballot result that invalidation of the election is necessary. Hollywood Ceramics Co., Inc., 140 N.L.R.B. 221, 223 (1962).

■ In applying this policy, the Board has emphasized that the election environment itself produces many instances of campaign impropriety which employees frequently ignore or discount. *Id.* Modine Mfg. Co., 203 N.L.R.B. No. 77, 1973, C.C.H. N.L.R.B. (¶ 25,352) p. 32,667, *enforced* 500 F.2d 914 (8th Cir. ·1974). Thus, before resorting to the serious remedy of invalidating an election, with its attendant dangers of delay, administrative over-extension, and frustration of the. goal of self-determination, the Board relies upon its experience and expertise in labor elections to determine, under all of the peculiar circumstances present, "whether the conduct could reasonably be expected to have an impact on the election." Hollywood Ceramics Co., Inc., *supra,* 140 N.L.R.B. at 224. *See generally,* Linn v. Plant Guard Workers, 383 U.S. 53, 60, 86 S.Ct. 657, 15 L.Ed.2d 582 (1965).

■ The courts have been mindful of the competing considerations present in

such a determination and thus deference is given to the Board's expert and considered opinion. In reviewing a Board decision in this area "[t]he substantial evidence test enunciated in Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), has no applicability. Rather, we must defer to the Board's expertise unless we are prepared to say that the discretion residing in the Board was abused." Follett Corporation v. N.L.R.B., 397 F.2d 91, 95 (7th Cir. 1968).

## II. MISREPRESENTATIONS

### a. *The Union's Power to Fine*

█ On May 8, 1972 company president Ragland wrote to the employees urging votes against the union. In the letter he said, among other things, "Even more shocking is the very great power which unions have to *fine* and *discipline* their members and make it stick." He cited examples of fines of employees who went back to work during a strike and of those who crossed a picket line.

On May 17 the organizing committee of the union wrote to the employees challenging as misleading, statements in three of Mr. Ragland's letters. The letter said in part:

"Mr. Ragland stated in his letter to you of May 8 that the Union fined people for crossing a picket line. What Union was he talking about? It was not this Union because under our Union Constitution we cannot fine anyone. If he tells you that it was this Union, then he is lying again. We are going to bring this mistruth and other lies that have been told to the attention of the National Labor Relations Board (U.S. Government)."

The company, in its objection to certification, presented copies of the constitutions of the international and its local unions, pointing out that there is no express prohibition against fines, and each constitution provides for a disciplinary procedure, the international referring to "fining" as one type of discipline, and the local referring to exacting "an appropriate penalty." No assertion was made as to the union's practice in fact with respect to fines for strike breaking or crossing picket lines.

The Regional Director assumed arguendo that the union was authorized by its constitution to fine members for breaking a strike, but concluded that the union's ability to fine its members for breaking a strike was a minor issue and that it is contrary to common experience to consider it a determinative issue in deciding an employee's vote. In addition, he concluded that propaganda of the nature complained of was well within the ability of the electorate to evaluate, considering the company's forewarning to discount union claims and common knowledge of the fact unions do have disciplinary procedures for infractions.

The Board adopted the Regional Director's recommendation. Chairman Miller, concurring separately on this point, said, on the basis of his own observations and experience, "I would exercise great restraint in those matters and would set aside elections only in those relatively rare instances in which a readily ascertainable pattern of the most egregious kind of clearly identifiable misrepresentations permeated the campaign so significantly that one would be compelled to conclude that voters of ordinary intelligence would have been incapable of forming a rational judgment on the basic issue of whether they wish to be represented by a labor organization (and, when appropriate, by which of the competing organizations they would prefer to be represented)."

We are not persuaded that the Board abused its discretion or acted arbitrarily or unreasonably in determining that the misrepresentation concerning the constitutional power to fine did not have a significant impact on the election. N.L.R.B. v. Red Bird Foods, Inc., 399 F.2d 600, 602 (7th Cir. 1968).

### b. *The Comparison Sheet*

█ In the May 17 letter, the organizing committee referred to a May 11

statement of Mr. Ragland that the union could not give the employees anything, and continued: "I am enclosing a comparison sheet of two places of business whose employees we represent in Corydon, Indiana. Compare the information listed with your present wages and benefits. Wouldn't you like to be making these wages and have these benefits at only a cost to you of $1.25 per week? IT DIDN'T TAKE A STRIKE TO GET THESE WAGES AND BENEFITS AT EITHER OF THESE TWO COMPANIES LISTED ON THE COMPARISON SHEET, EITHER!"

The comparison sheet listed wage rates and benefits in three columns, one headed Corydon Nursing Home and the others headed with the names of other employers in Corydon. At the bottom of the sheet, there appeared: "Don't you think that it is worth a $1.25 per week to receive the Union wages and benefits that the Union Companies of Corydon, Indiana pay their employees?" The company's objections stated there were various misrepresentations, including the fact that the union agreement with one of the employers had not been approved by government authorities and the benefits were not in effect.

The Regional Director reviewed the contracts in question and found that the comparison sheet was a substantially accurate reflection of the contracts. One of the contracts was fully implemented. The other apparently exceeded wage stabilization guidelines and was being renegotiated in order to conform. The Regional Director interpreted the comparison sheet as no more than a representation of negotiated benefits. It surely can be read as a representation that the other employers were then paying and their employees receiving the benefits set forth. As to one of the employers, then, it failed to disclose a fact necessary to make the other facts not misleading, and was a misrepresentation to that limited extent. Nevertheless we find no abuse of discretion in deciding that it was not "an objectionable misrepresentation within the *Hollywood Ceramics* rule."

This case is not one in which the union is allegedly claiming credit for a contract increase which has never in fact been agreed to, N.L.R.B. v. Producers Cooperative Ass'n, 457 F.2d 1121, 1126 (10th Cir. 1972), or is substantially inflated, N.L.R.B. v. Millard Metal Service Center, Inc., 472 F.2d 647, 650–651 (1st Cir. 1973), Gallenkamp Stores v. N.L.R.B., 402 F.2d 525, 534 (9th Cir. 1968); nor is it a case in which the increase claimed by the union was in fact obtained by a second union, N.L.R.B. v. Maine Sugar Industries, 425 F.2d 942, 945 (1st Cir. 1970), or, by the terms of the agreement, not to be received by the employees for a substantial period of time, Cross Baking Co. v. N.L.R.B., 453 F.2d 1346, 1349 (1st Cir. 1971). Rather, the company here complains only that the terms represented by the union as being paid A & P employees, while having been agreed to by both parties, were not in effect due to a failure to comply with federal wage and price guidelines.

We agree with the Sixth Circuit that "[i]nformation about the wage freeze was not within the special knowledge of the union. It had been widely publicized and debated. And, the federal government had established places where answers to specific questions about the freeze could be obtained." Harlan # 4 Coal Co. v. N.L.R.B., 490 F.2d 117, 125 (6th Cir. 1974).

### c. *Closeness of the Vote*

The closeness of a vote may play a part in assessing the effect of a misrepresentation upon the results of an election. Follett Corporation v. N.L.R.B., *supra,* 397 F.2d at 95, n. 3. But the mere fact that the vote is close will not compel the conclusion that a misrepresentation probably had an impact on the election result. N.L.R.B. v. Red Bird Foods, *supra,* 399 F.2d at 603; N.L.R.B. v. Visual Educom, Inc., 486 F.2d 639, 643 (7th Cir. 1973).

## III. LACK OF HEARING

It is well established that in a refusal-to-bargain unfair labor practice

proceeding, there need be no evidentiary hearing to establish facts on which a certification is challenged if the company's objections have been adequately litigated and determined in the prior representation proceeding. Macomb Pottery Co. v. N.L.R.B., 376 F.2d 450, 452 (7th Cir. 1967); Baker Canning Co. v. N.L.R.B., 505 F.2d 574 (7th Cir. 1974).

The underlying facts as to the misrepresentations are virtually undisputed. The only question which approaches being an issue of fact is whether the misrepresentations had a significant impact on the outcome of the election, and that is more a question of reasonable probability than one of fact. The answer is one as to which the Board has wide discretion and is legitimately influenced by administrative experience and expertise.

Testimony by voters as to their motivation in voting is likely not to be satisfactory or useful. Cf. N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 608, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); N.L.R.B. v. Clearfield Cheese Co., 322 F.2d 89, 93–94 (3rd Cir. 1963). The more likely character of evidence tending to show that a particular statement probably had an impact on the outcome would be evidence that an issue to which it related was hotly contested and an important concern of the electorate, evidence bearing upon the degree to which the relevant facts are known among the group involved, and evidence tending to establish the magnitude of the alleged misrepresentation. The company failed to suggest that it could offer such evidence either at a hearing in the representation proceeding or in the complaint proceeding. No hearing was required under the circumstances.

The Board order will be enforced.

PELL, Circuit Judge (dissenting).

In an era of increasing emphasis on truth and candor in government, and, indeed, in the private sector as reflected, for example, in truth-in-lending legislation, it is unfortunate that either an administrative or a judicial decision should give the appearance of tolerating, if not outright approving, substantial factual misrepresentations which could not but have had a significant impact upon the determination of whether the majority of the employees of a company desired a particular Union to represent them. I therefore respectfully dissent.

The facts are simple and relatively undisputed. The Union's letter was mailed to employees so that it was received the day before the election. There was no effective opportunity for the company to investigate and respond to the matters stated in the Union letter. The Union letters stated unequivocally that it could not fine anyone. The letter further stated that if the company president was saying that this Union could fine anyone "then he is lying again." The letter further said that "this mistruth" would be brought to the attention of the National Labor Relations Board. The undisputed fact in the record is that this Union could levy fines. Further, the letter enclosed a comparison sheet which clearly indicated that a local grocery whose employees the Union represented was paying higher wages than those at the company here involved. The undisputed fact is that the wages listed were not being paid. When the recipients of the letter cast their secret ballots a change of one vote potentially could have changed the result of the election. Even if the challenged votes had been counted and had been cast for the Union the decision would have remained a close one with a relatively few undecided-until-the-last-minute votes controlling the direction in which the majority would come down.

Since the majority opinion and both parties in their briefs have found it appropriate to cite language in Hollywood Ceramics Company, Inc., 140 NLRB 221 (1962), I turn to that case for the proper standard to be applied in the present situation, which standard I assume is one to be applied evenhandedly irrespective of whether the alleged prevaricator is a

labor organization or an employer. The circumstances in which the election will be set aside because of misrepresentations of a party to the election derived from *Hollywood Ceramics* are summarized as follows: (a) where the statement represented a substantial departure from the truth which may reasonably be expected to have a significant impact on the election; (b) where the party making the representation was in an authoritative position to know the truth or had special knowledge of the facts; (c) where the employees had no independent knowledge of the misrepresented facts so that they could not effectively evaluate the propaganda; and (d) where the other party to the election had no adequate opportunity to respond and correct the representation.

Referring now to the facts of the present case, the timing of the letter was such as to preclude an opportunity for either the employees or the company effectively to evaluate the accuracy of the representations or to ascertain the incorrectness thereof. In the company situation, even if time had permitted learning the truth, there was no adequate opportunity to correct the misapprehensions which had been placed in the minds of the employees. Since the Board in *Hollywood Ceramics* indicated that it was immaterial whether the misrepresentation was deliberate, it is not necessary to explore the inferences in that respect. It does, however, appear rather clear from the fact of the delay until May 17 for the delivery of an answer to a company communication of May 8 that making it impossible for the company to refute the assertions was deliberate.

With reference to point (b) of the outlined circumstances I have difficulty in determining how anyone could be in more of an authoritative position than the Union (a) to know what wages were actually being paid at an establishment at which it represented the employees and (b) to know whether it could levy fines.

It would be strained to say that statements which are the exact opposite of the truth are not "a substantial departure from the truth." The remaining circumstance for analysis, and the one on which I believe the present decision should turn, is whether the departure from the truth may reasonably be expected to have a significant impact on the election.[1] In my opinion there can be only one answer.

I consider first the matter of the incorrect information concerning the wages paid at another Union-represented establishment. I do so on the not unreasonable assumption that the average wage-earner is probably more interested in what the Union can do for him than what it can do to him. In the same volume of the NLRB reports in which *Hollywood Ceramics* is found, the decision in Walgreen Co., 140 NLRB 1141, 1143 (1963), would seem to be applicable to the present case:

"Although the Board, as a general rule, does not undertake to police or censor propaganda material used by participants, we find that the misrepresentations circulated here so lowered the standards of campaigning as to warrant the use of the Board's corrective powers. Thus, the Petitioner's handbill *on its face* purported to indicate composite wage and vacation benefits obtained for *all* its members. This information was distributed to employees on the eve of the election, too late for the Employer to check the information contained therein, and to

1. Indeed, it has been stated that where "an election is extremely close, even minor misconduct cannot be summarily excused on the ground that it could not have influenced the election." Henderson Trumbull Supply Corporation v. NLRB, 501 F.2d 1224, 1230 (2d Cir. 1974). Because of my view of the egregiousness of the misrepresentation in the present case I am treating the closeness as only one of the several factors calling for denial of enforcement of the Board's order.

communicate the correct facts to the employees. Moreover, the employees themselves had no independent means of knowing that the above information was untrue, and had every reason to accept it at face value as they knew that the Petitioner was in fact an authoritative source concerning benefits secured for its own members. We, therefore, are of the opinion that the handbill in question could not be intelligently evaluated by the employees, and was reasonably calculated to deceive the employees as to material matters. In view of the importance to employees of local wage and fringe benefits as an argument for or against unionization, we find that substantial doubt is raised whether the results of the election reflected the free choice of the employees. Accordingly, we shall sustain the Employer's objections, and set the election aside." (Footnotes omitted. Emphasis in the original.)

While the assertions as to wages elsewhere was not as sweeping in the present case as in *Walgreen,* nevertheless, viewing the particular representation in the context in which it was delivered, the impact was certain to be considerable. Corydon, Indiana, although the first capital city of the state, is a town of less than 3000 people located some 20 miles from the nearest metropolitan area. It would be of real interest to the voters in this election that at a local grocery store the Union seeking to represent them had negotiated a contract by virtue of which the minimum *being paid* was 50¢ more an hour than they were receiving and the maximum was nearly $2.00 more. I have emphasized the words "being paid" because the Regional Director in concluding the representation had no significant impact erroneously said that the comparison sheet "is what it purports to be, a compilation of negotiated wages and benefits secured by the Petitioner." The error is that the compilation which listed only two other employers did not stop with what had been secured by way of negotiation but

rather phrased the matter as being the "Union wages and benefits that the Union Companies of Corydon, Indiana, *pay* their employees." (Emphasis added.) Further, the so-called comparison sheet stated that "*to get* the above Union wages" the grocery store employees did not have to strike. (Emphasis added.)

While it might be argued that in this small community there was a reasonable likelihood that some of the nursing home employees would know from friends or neighbors that the grocery store employees had not gotten or were not being paid the listed wages, the record does not show any such awareness. Conceivably this could have been developed at a hearing but that procedure, although requested by the nursing home, was denied.

While I have considered as a primary matter the misrepresentation as to wages because of the primary position this subject undoubtedly occupied in the minds of the people concerned, I do not in the present situation believe that the misrepresentation as to the levying of fines was without substantial impact.

A false representation as to state laws forbidding fining members was held to be significant in NLRB v. G. K. Turner Associates, 457 F.2d 484 (9th Cir. 1972).

In the present case the Regional Director in part dismissed the misrepresentation as having significance by stating that "[i]t is contrary to common experience to imply that employees designating a union to represent them . . . will be majorly concerned by the fact that the union has the power to penalize their follow employees who break strike and defeat their efforts to obtain a contract." As an initial matter, the Regional Director's analysis narrows the issue improperly by tying it merely to strikes occurring during the process of attempting to secure a contract. Strikes, of course, are not limited merely to this particular factual context. The letter of the company of May 8 spoke of the

"great power which unions have to *fine* and *discipline* their members and make it stick." (Emphasis in the original.)

In the company letter, the president adverted to the situation of women employees who had gone back to work during a strike in order to support themselves and their children and who had been fined by the Union involved in the work stoppage. I should add that it is in no way my intention to denigrate the use of the strike weapon in legally appropriate situations. It is a legitimate tool of great strength which, despite headlines suggesting otherwise, is probably used sparingly in the overall industrial scene. This, however, in no way justifies a misrepresentation as to the consequences which may be visited upon those who are properly subject to. Union discipline.

While the Regional Director spoke of "common experience" that employees in designating a Union would not be "majorly concerned" with the matter of possible penalties, a special factor exists in the present situation which would not be involved in the majority of cases. That special situation is found in the appropriate unit which was all full-time and regular part-time employees of the nursing home, excluding, of course, office clericals, professionals, guards, and supervisors. In the event of a strike by the Union representing all of the people who are involved in the day-to-day care of patients in a nursing home we do not have the situation of a person who might cross a picket line to engage in the relatively uninspiring work of fastening a screw into identical successive machines on an assembly line. Here, the striker would be confronted with the realization that her staying away from work might well be the cause of deprivation of necessary care of patients for whom she felt a responsibility and with whom she may well have formed personal relationships. I find it difficult to believe that nursing home employees in evaluating the pros and cons of how to cast their ballot might not be substantially influenced by

the thought that if a strike should occur they would not be subject to a fine if they should decide that the exigencies of a patient's care required their presence inside the nursing home.

Further, I cannot conceive that the expertise of the Board to which the courts pay homage does not encompass an awareness that one of the standard lines of attack of a company resisting unionization is a reference to the possibility of fines being levied if the Union is successful. Unless we assume that those who prepare the companies' propaganda are naive and out of touch with the facts of life, we must conclude that a substantial body of expertise in the labor-management relations field is of the opinion that the possibility of a fine being levied is of significance to the employee who is to cast his ballot. The reference to the possibility of fines may or may not be by itself a decisive factor in many cases but it appears to me to be unrealistic to discount its significance in the case of nursing home employees.

Further, the Regional Director, as an alternative ground, stated that "the factual context in which it occurred is indistinguishable from the situation in which the Board has held a generalized misrepresentation concerning a union's ability to fine members not to constitute proper cause to set aside an election." But this statement ignores the factual context of the nursing home to which I have already referred. Thus when the Regional Director observed that it was "contrary to common experience to consider it a determinative issue in deciding an employee's vote," he was not dealing with a common experience situation.

The authority of Unions to fine members for crossing picket lines is not an insignificant issue but has been a controversial labor relations question recurring in recent years. The Supreme Court has deemed resolution of conflicting principles involved in the situation important enough in the past few years to grant certiorari in. order to delineate the ex-

tent and scope of a Union's authority to discipline its members for what would otherwise be protected activity:

> NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967).
>
> Scofield v. NLRB, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969).
>
> NLRB v. Granite State Joint Board, 409 U.S. 213, 93 S.Ct. 385, 34 L.Ed.2d 422 (1972).
>
> NLRB v. Boeing Company, 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973).
>
> Booster Lodge No. 405 v. NLRB, 412 U.S. 84, 93 S.Ct. 1961, 36 L.Ed.2d 764 (1973).
>
> Electrical Workers (IBEW) v. NLRB, 159 U.S.App.D.C. 272, 487 F.2d 1143 (1973), aff'd, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974).

Finally, a secondary impact of significance exists in the May 17 letter. Not only did the Union misrepresent its lack of constitutional authority to fine members, it accused the company of lying on the subject and stated its intention to prosecute that accusation with the Board. The courts have looked with disfavor upon attempts to stamp the approval of the U. S. Government on campaign literature. See, e. g., NLRB v. John S. Barnes Corporation, 478 F.2d 1105 (7th Cir. 1973). Aside from this aspect of the case, the representation that the employer was deliberately misleading them by lying, unanswered by the employer as the Union could not but have known would be the fact, is sufficient to cause undecided votes to be cast for the Union which had exposed the untrustworthiness of the employer.

Therefore, in sum and with all due deference to "the Board's expert and considered opinion," it appears obvious to me that the Board's decision that the last minute misrepresentations of fact by the Union could not possibly have had a significant impact on the election consti-

tutes an abuse of discretion and is not supported by substantial evidence on the record as a whole. I would deny enforcement of the Board's order.