NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BAYLISS TRUCKING CORPORATION
and Bayliss Fuel Oil Corpora-
tion, Respondents,

and

Amalgamated Local Union 355,
Intervenor.

No. 98, Docket 34467.

United States Court of Appeals,
Second Circuit.

Argued Oct. 14, 1970.

Decided Oct. 28, 1970.

Herbert Fishgold, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Atty., and Ian D. Lanoff, Atty., N. L. R. B., of counsel), for petitioner.

Benjamin Mandelker, New York City, for respondents.

Harold Dublirer, New York City (Dublirer, Haydon & Straci, New York City, of counsel), for intervenor.

Before CLARK, Associate Justice,* LUMBARD, Chief Judge, and KAUFMAN, Circuit Judge.

IRVING R. KAUFMAN, Circuit Judge:

At a representation election held on June 6, 1968 the employees of respondent Bayliss Fuel Oil Corporation [1] (Bayliss) decided to oust their then bargaining agent, Amalgamated Local Union 335 (Amalgamated), and elected to be represented by Teamsters Local 553 [2] (Teamsters) in its stead. Amalgamated received five votes, the Teamsters seven; no employee voted to be represented by neither. Anxious to contest the resulting certification, Bayliss refused to bargain with the Teamsters. The petitioner National Labor Relations Board (Board) concluded that it had thereby violated sections 8(a) (1) and (5) of the National Labor Relations Act, 28 U.S.C. §§ 158(a) (1), (5), and on June 30, 1969 ordered it to bargain with the Teamsters. The Board now seeks enforcement of that order. Bayliss and Amalgamated attack its validity on several grounds. They urge that the designated group of employees constituted an inappropriate bargaining unit and that the election was barred by Amalgamated's bargaining agreements with Bayliss. Moreover, they argue that ballot irregularities rendered the outcome untrustworthy and that the Board refused to give the necessary review to the proceedings leading up to the election. We reject each contention and grant enforcement of the Board's order.

---

* United States Supreme Court, retired, sitting by designation.

1. Two corporations, Bayliss Fuel Oil Corp. and Bayliss Trucking Corp., are actually before us. They are under common ownership and management, however, and carry out an integrated business operation. It was stipulated in representation proceedings that they constituted a single employer under the National Labor Relations Act, 29 U.S.C. §§ 151 et seq.

2. "Coal, Gasoline, Fuel Oil Teamsters, Chauffeurs, Helpers, Oil Burner Installation, Maintenance, Servicemen, and Helpers, Local 553, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America."

## I.

Bayliss sells fuel oil and installs and maintains oil burners in the vicinity of Ronkonkoma, New York. Its servicemen, varying in number from five to seven, depending upon the season of the year, install the burners and keep them in repair; the drivers, constituting three to six in number, deliver oil to customers' tanks, and assist the servicemen on occasion in the slow summer months. Both groups receive their assignments from the dispatcher, who, like the mechanic responsible for maintaining the service and delivery trucks, works full time on company premises. Since at least 1961, these employees were represented by Amalgamated as a single bargaining unit, and a three-year contract covering all of them had been signed by Amalgamated and Bayliss on July 20, 1965.

In June 1967, Bayliss took over the accounts of the Peninsula Petroleum Corporation, a small, noncompeting fuel oil company owned by Bayliss' Vice-President. Peninsula's one serviceman and one driver became Bayliss employees, and their respective trucks became part of the Bayliss fleet. Allegedly because of this operating merger, Amalgamated and Bayliss negotiated a new three-year contract on August 22, 1967, almost a year before the 1965 agreement was due to expire. Later that year, on November 15, Amalgamated again renegotiated its agreement, obtaining separate contracts for the drivers (and the mechanic) and for the servicemen (and the dispatcher). The terms were otherwise identical with the August 1967 agreement.

The following spring, on March 28, 1968, the Teamsters petitioned for a representation election in a unit comprising both the servicemen and the drivers. Under Board rules,[3] this petition was timely as to the 1965 contract,

but barred by the 1967 contracts unless these were premature or inappropriate extensions of the former. The NLRB Regional Director decided on May 5, 1968 that the 1967 contracts were invalid. He also rejected Bayliss' and Amalgamated's contentions that a unit including both drivers and servicemen was inappropriate. The Board declined to review the Regional Director's decision and direction of an election, finding that no substantial issues warranted review.[4]

At the preelection conference on May 15, Amalgamated drew its choice of ballot position, and opted for the left-hand side; the Teamsters chose the right side, leaving the center position for a "neither" vote. Amalgamated allegedly instructed its adherents to check off the left-hand box. The sample ballot issued two weeks later, however, showed that the Board had inadvertently switched the ballot positions so that the Teamsters, rather than Amalgamated, appeared on the left. The sample ballot was posted above the dispatcher's window for a week before the election, with instructions that it should be read and initialed. Seven or eight employees complied with the request.

The election itself was held on Bayliss premises between 5:00 and 6:00 p.m. on June 6. A Board agent explained the ballot, including the respective positions of the unions, in some detail before distributing them. The voting resulted in the tally already noted, and then only, and for the first time, Bayliss and Amalgamated complained of the transposed positions. The Regional Director, in certifying the Teamsters as bargaining representative, rejected the contention that the Board's printing error had rendered the election untrustworthy.

Despite the certification, Bayliss refused to bargain with the Teamsters.

---

3. See Leonard Wholesale Meats, Inc., 136 NLRB 1104 (1962). In general, a rival union may petition for an election only in the period between the 90th and 60th days before the expiration of a valid bargaining agreement. A contract may bar a rival petition for no more than three years, and only extensions negotiated within its last 60 days bar subsequent petitions.

4. See 29 C.F.R. § 102.67(c) ("The Board will grant a request for review only where compelling reasons exist therefor").

An unfair labor practice complaint was then filed by the Board's General Counsel, and sustained by a Trial Examiner, whose decision the Board in turn affirmed on June 30, 1969. In these postelection proceedings, however, only the ballot irregularity was considered; the Board's rule against relitigation [5] precluded consideration of the matters disputed before the election—unit appropriateness and contract bar.

## II.

In reviewing the appropriateness of the plant-wide bargaining unit at Bayliss, we are mindful of the Supreme Court's cautionary instruction that this issue "involves of necessity a large measure of informed discretion and the decision of the Board, if not final, is rarely to be disturbed." Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). Not finding the Regional Director's determination "unreasonable and arbitrary," *id.*, we must affirm his conclusion that the unit was appropriate.

■ Indeed, there was substantial support for the Regional Director's decision. Although the Bayliss servicemen were somewhat more skilled than the drivers, the two groups received comparable hourly wages—$3.55 and $3.20 respectively.[6] Both were under common supervision by Bayliss' Vice-President, its office manager, and the dispatcher, and enjoyed identical nonwage benefits. And the substantial history of bargaining as a single unit had failed to demonstrate any conflict of interest, real or imaginary, between the servicemen and drivers. Bayliss' argument—emphasizing the different training periods for service and delivery employees, the existence of a "leadman" among the servicemen, and an industry-wide pattern of separate representation—at most shows that separate bargaining units might also have legitimately been found appropriate units; it hardly constitutes a convincing showing that the single unit was inappropriate or unreasonable.

■ From the foregoing it would appear to be a logical sequela that the 1965 single-unit contract between Bayliss and Amalgamated was not invalid because it embraced an inappropriate unit. The November 1967 negotiation of separate contracts accordingly had no justification and must be viewed as a premature and inappropriate extension of the 1965 agreement. It is equally clear that the accretion of the two Peninsula employees did not cause the 1965 agreement to lapse, and neither Bayliss nor Amalgamated presses this justification for the August 1967 contract before us. Neither 1967 contract therefore barred the Teamsters' petition in the spring of 1968.

## III.

■ Bayliss and Amalgamated argue strenuously that the reversal of ballot positions after adherents had been instructed which side to check, compounded by the similarity of the numbers of the locals and the closeness of the vote, require the election to be set aside. In order to take the day on this issue respondent and intervenor face the substantial task of persuading us that the Board's refusal to set the election aside amounted to a "glaring abuse." NLRB v. Olson Bodies, Inc., 420 F.2d 1187, 1189 (2d Cir. 1970). The fact that no complaint was made until after Amalgamated lost the election makes the task of persuasion more difficult.[7]

---

5. See Amalgamated Clothing Workers v. NLRB, 124 U.S.App.D.C. 365, 365 F.2d 898, 902–904 (1966); 29 C.F.R. § 102.-67(f). Generally, a matter litigated in a representation proceeding will not be reheard in a related unfair labor practice proceeding unless newly discovered or previously unavailable evidence is presented.

6. Apprentice servicemen earn $2.40 an hour.

7. We do not view the preelection silence as a formal waiver of objections because Board rules specify that objections to the conduct of the election shall be submitted within 5 days after the tally of ballots

■ It is conceivable that the reversal of positions affected the outcome of the election. But more than the theoretical possibility of a tainted result must be established before we will overturn the Board's conclusion that the irregularity was harmless. And the facts in this case make it difficult indeed to believe that the Bayliss employees were confused when casting their ballots. The testimony clearly demonstrated that the official forms had been posted prominently for a week prior to the election, and the Board's agent carefully explained the ballot immediately before the voting. And while the local numbers were similar, the names of the respective unions, as listed on the ballot, were quite different. On the left side was the agglomeration of words "Coal, Gasoline, Fuel Oil Teamsters, Chauffeurs, Helpers, Oil Burner Installation, Maintenance, Servicemen and Helpers, Local 553, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 553, International Brotherhood of Teamsters)." On the right side of the "Neither" position (which separated the descriptions of the two unions) was the simple phrase "Amalgamated Local Union 355." The Bayliss employees were all literate,[8] and it is highly improbable that any failed to distinguish between a union which had represented the Bayliss workers for at least seven years and a newcomer of national prominence.

### IV.

■ The last objection against the Board's order is not unfamiliar to us. Relying heavily on our decision in Pepsi-Cola Buffalo Bottling Co. v. NLRB, 409 F.2d 676 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 219, 24 L.Ed.2d 181 (1969), Bayliss and Amalgamated argue

that the Board's refusal to hear the appeal from the Regional Director's order setting an election, combined with its rule against relitigation, resulted in a failure by the Board to give plenary consideration to the questions relating to unit appropriateness and contract bar. Like Pepsi-Cola, they assert that they would be deprived of an important right were we to enforce a Board order which rests on the Regional Director's determination of these issues. In *Pepsi-Cola* the Board, because of its restrictive regulations, had merely "rubber-stamped" the Regional Director's determination on the concededly difficult issue whether certain distributors were independent contractors or employees. The Board agreed that this issue was "difficult and require[d] a fine-drawn balancing of facts and law," 409 F.2d at 679, and it argued that under NLRB v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed. 2d 1083 (1968), we should defer to its resolution of such a close legal question. We pointed out, however, that *United Insurance* had premised that deference upon the fact that the Board had given plenary consideration to that very question, and because we desired the benefit of the Board's expert views on the same independent-contractor question, we required it to do likewise in *Pepsi-Cola*.

The issues in this case, however, are quite unlike the difficult question of mixed fact and law presented in *Pepsi-Cola*. The contract bar claim totters on the brink of frivolity, and a wise resolution of the question of unit appropriateness depends much less upon legal expertise than upon an intimate familiarity with circumstances at the particular plant. The relationships among job classifications there, the employees' sense of common interest vis-a-vis that particular employer, the plant's history of

is released. 29 C.F.R. § 102.69(a). But the silence does blunt the force of the argument that correct ballot positions were crucial.

8. Compare Dedman Foundry & Machine Co., 52 NLRB 609 (1943), another case

involving a ballot position change, in which the Board decided to hold a new election partly because some of the voters were allegedly illiterate.

labor relations, are matters which, unlike the issue in *Pepsi-Cola,* are peculiarly within the ken of the Board's local representatives who are close to the scene, and much less would be gained by requiring the Board to afford plenary review.[9] We would not add to the Board's already long docket unless we were quite certain, as we were in *Pepsi-Cola,* that the Board's expert and informed views could be of substantial aid to the court's resolution of difficult issues. See Pepsi-Cola Buffalo Bottling Co. v. NLRB, 409 F.2d at 681 ("[I]t is in the cases which present difficult, factual and legal issues that the Board's superior knowledge and background is most desirable"). Cf. NLRB v. Olson Bodies, Inc., 420 F.2d 1187 (2d Cir. 1970). See also Kaufman, Judicial Review of Agency Action: A Judge's Unburdening, 45 N.Y.U.L.Rev. 201 (1970).

Petition for enforcement granted.

9. We note that under Board rules it will review a Regional Director's representation decision if it is shown:

   (1) That a substantial question of law or policy is raised because of (i) the absence of, or (ii) a departure from, officially reported Board precedent.

   (2) That the regional director's decision on a substantial factual issue is clearly erroneous on the record and such error prejudicially affects the rights of a party.

   (3) That the conduct of the hearing or any ruling made in connection with the proceeding has resulted in prejudicial error.

   (4) That there are compelling reasons for reconsideration of an important Board rule or policy.

29 C.F.R. § 102.67(c).