**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**VISUAL EDUCOM, INCORPORATED, Respondent.**

No. 72–2002.

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1973.

Decided Sept. 19, 1973.

Peter G. Nash, Gen. Counsel, Joseph C. Thackery, Atty., N. L. R. B., Washington, D. C., for petitioner.

James J. Crowley, Jr., Newark, N. J., for respondent.

Before CLARK, Associate Justice,* KILEY, Circuit Judge, and CAMPBELL, Senior District Judge.**

KILEY, Circuit Judge.

The National Labor Relations Board (Board) petitions for enforcement of its order, pursuant to 10(e) of the Act, 29 U.S.C. § 151 et seq., granting summary judgment that, *inter alia*, Visual Educom, Incorporated (Respondent), of Michigan City, Indiana, upon request, bargain collectively with the Union [1] with respect to "rates of pay, wages, hours and other terms and conditions of employment." We order enforcement.

On August 20, 1971 the Union filed a representation petition with the Board seeking to represent a unit [2] of the Respondent's employees. A consent elec-

tion was held on October 8, 1971, and resulted in 55 votes for, and 49 against, the Union. Eleven ballots were challenged. Pursuant to stipulation, three of the challenges were sustained and the remaining eight ballots were opened and counted. The final tally was 57 for, and 55 against, the Union.

The Respondent filed two timely objections to the election. The Regional Director conducted an *ex parte* investigation of the objections and found that there was no warrant for setting aside the election. The Respondent filed exceptions, supported by affidavits, and requested a hearing to resolve factual issues. A three member panel of the Board adopted the Regional Director's holdings, and on March 10, 1972 certified the Union. Thereafter the Union requested the Respondent to bargain, and it refused. Subsequently, on April 13, 1972, the Regional Director filed a complaint "alleging" the Respondent's unfair labor practice under § 8(a)(1) and (5) of the Act. The Respondent answered and the General Counsel then moved for summary judgment, asserting that all the issues raised in the answer had previously been litigated. The Board panel transferred the proceedings to the Board, which found that "all factual and legal issues raised ha[d] been determined . . . by a prior Board determination," and ordered the Respondent to bargain.

The Respondent opposed entry of summary judgment on the ground that material issues of fact existed. Its position is that having filed exceptions to the Regional Director's report, it was entitled to an evidentiary hearing on its objections.

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

** Senior Judge William J. Campbell of the United States District Court for the Northern District of Illinois, sitting by designation.

1. Local 1392, International Brotherhood of Electrical Workers, AFL–CIO.

2. The parties stipulated and the Board found that the unit of "[p]roduction and maintenance employees . . . excluding all office clerical employees, professional employees, guards, and supervisors" was an appropriate unit for collective bargaining within § 9(b) of the Act.

The question before us is whether there are material issues of fact needing decision and whether denial of a hearing invalidated the Union certification as bargaining representative. The Respondent has the burden of persuasion. NLRB v. Red Bird Foods, Inc., 399 F.2d 600, 602 (7th Cir. 1968). It contends that the objections as a whole, examined in the light of the evidence supporting its objections, disclose factual misrepresentations which were substantial departures from truth, made so near the election as to prevent the Respondent from effectively refuting, or to allow the employees to independently evaluate, Union misrepresentations. For these reasons it contends the impact of these misrepresentations reasonably could have unduly inhibited the free choice of the employees in the election. The possible impact is said to be especially crucial in view of the close vote. The Respondent concedes that "if" the certification is proper the bargaining order should be enforced.

The consent election was scheduled in September 1971, to be held on October 8, 1971. The Respondent began its campaign with a speech on August 25 and continued with letters to its employees on September 15, 22 and 30, and another speech on October 6. These communications emphasized how management was working to represent the best interests of the employees. The campaign material stressed that the Respondent had overcome financial problems and was on the way to profits and to providing stable employment with competitive wages and benefits. The Respondent stated it knew of "no union that kept a plant open for the employees" under similar economic conditions.

Additionally, Respondent made the following representations: Union campaign promises meant nothing; a wage contract had to be negotiated; the only certainty if the Union won was monthly Union dues; employees "may be subject to threat or coercion" which should be reported to the Board; employees' votes are secret and can be cast safely; signed cards "mean nothing;" and no employee would lose a job because of his vote.

In subsequent campaign material Respondent asserted: if the Union won, employees would have to pay at least $6.50 per month dues; many unions had increased dues "again and again;" employees may be subject to "special fees and assessments," "can be threatened" with suspension from the Union for non-attendance at meetings, and forced to picket at some other company; the Respondent was "strongly opposed" to unionization, was "100% non-union" but if a majority of employees voted for the Union there would be no inequities among employees and the Respondent would bargain in good faith; and, finally, in slack periods the Respondent would have to move people around, but Union security rules often blocked this "need [of] agility."

At a Union meeting on October 6, 1971 Lawson, a Union representative, spoke to the "30–40" employees in attendance. His statements at that meeting are the subject of the two objections filed by the Respondent with the Regional Director. The objections are that the Union falsely represented that the Respondent "was financially able to increase wages, that . . . [it] made a profit of four cents on every dollar" it spent for employees' insurance; and that it misrepresented that "specific companies" were part of the Respondent and were unionized.

The Respondent supported its objections with the names of seven witnesses, all employees,[3] who attended the Union meeting. Each of these employees, after the meeting, asked the Respondent about the truth of Lawson's statements. The Respondent provided the Regional Direc-

---

3. An employer representative later testified that two of the named witnesses did not attend the meeting. Those who did testify were identified in the Regional Director's report as A, B, C, D and E.

tor with a summary of anticipated testimony of the witnesses.

## I

The Regional Director took testimony from the Respondent's witnesses and his report set forth the substance of their testimony relevant to Lawson's alleged misrepresentation concerning management profit from its employee insurance plan. The witnesses all agreed that Lawson talked about the Respondent's employee insurance payments and, although expressing it differently, each indicated the thrust of Lawson's statement was that the Respondent was profiting from the employee insurance plan.[4] The report recites the substance of Lawson's testimony: employees should not pay any cost of insurance; it was to the Respondent's benefit to pay insurance premiums because of tax considerations; and the Respondent could deduct insurance premiums as an "operating" expense.

We disagree with the Regional Director's appraisal of the testimony of the five witnesses. He describes the testimony of B and C as "grossly conflicting" and of A and E as "conflicting." It is true: Witness A did not "remember too much," "didn't pay too much attention" and did not "remember his explanation." Witnesses C and D, respectively, said they "didn't understand what [Lawson] was saying," and "didn't understand what he was trying to explain." And E said "I can't remember too much about the meeting. . . ." Nevertheless, each of the five stated Lawson talked about insurance and gave the impression that the Respondent benefited by paying employees' insurance premiums.

Lawson's testimony is not contrary to the witness' impressions. Also he and the witnesses agreed that what he said was prompted by a question "from the floor." And both he and they agreed he used a blackboard in explanation.

The Respondent's second objection was aimed at Lawson's statement that plants owned by the Respondent in the East were unionized. This statement was made in response to a Respondent campaign letter of September 30, 1971 that it was 100% non-union. Here again the discussion was prompted by questions from the floor.

Lawson's testimony in the Director's report is that he discussed the probable unionization of other companies named on the letterheads. The résumés of testimony of A, B, C, D and E differ in some respects as to what Lawson said. Their impressions indicate that Lawson may have stated that it was not true that the Respondent was 100% non-union. The Regional Director took the evidence of the witnesses "most favorably" for the Respondent and found that Lawson was "misled by an inference" he drew from the Respondent's letterhead and "asserted or suggested" one of the Respondent's plants was organized.

While we disagree, as noted above, with the Regional Director's characterization of the five witnesses' testimony as inconsistent and unreliable, we agree with his finding that quite "independent[ly]" the alleged misrepresentation concerning insurance payments was not "reasonably calculated to affect the results of the election;" and that the insurance matter was not a campaign issue.

The evidence reported by the Director did not compel him to find that the witnesses' various impressions of Lawson's statements were likely to interfere with their free choices in casting ballots. Assuming, arguendo, the validity of the

---

4. Witness A said Lawson "quoted something like the Company made 4¢ per person off the insurance . . . ." Witness B thought Lawson said "we would probably find the Company is making 4¢ on every insurance dollar." Witness C said Lawson said "they [the Respondent] get a certain percentage back." Witness D remembered Lawson saying the "Company was coming out ahead on insurance." Finally, Witness E testified that Lawson said the Respondent was "4¢ ahead on each of us" at the end of the year.

tenuous claim that the Respondent had no time between 9:00 a. m. October 7 and 2:00 p. m. October 8 to answer Lawson, we are not shown what it would have said in rebuttal. The closeness of the vote does not, on this record, require that the election be set aside. *See Red Bird-Foods, Inc., supra.* As we have noted by references to the Respondent's literature, the campaign was vigorous, and Lawson's statement concerning insurance was not entirely untrue and was invoked by questions from his audience. We think the Regional Director applied proper criteria in his report and cannot say that he has not properly balanced the elements needed for his decision that the election was not tainted by Lawson's statement about insurance. Follett Corp. v. NLRB, 397 F.2d 91 (7th Cir. 1968).

The Regional Director could properly decide on the basis of the testimony that Lawson's probable assertion about unionization, while untrue, was not likely to affect the outcome of the election. The recollections of the witnesses were so vague that it is not reasonable to infer that any one of them would carry away resentment against the Respondent for stating in the September 30, 1971 letter that it was 100% non-union. The Regional Director could balance the vagueness of the recollections, the "wide latitude" allowed in the Board election campaigns, Linn v. United Plant Guard Workers, 383 U.S. 53, 60, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), citing Stewart-Warner Corp., 102 N.L.R.B. 1153, 1158 (1953), and the "good sense" of the employees in deciding whether or not to believe the Respondent was 100% non-unionized.[5] *Id.*

We hold that the Respondent has not succeeded in carrying its burden of showing that the Regional Director erred in his conclusions from the testimony of the five witnesses.

## II

We see no merit in the Respondent's contention that the certification is invalid because Respondent was denied a hearing on its objections to the election. It did not ask the Regional Director for a hearing on its objections. Despite its burden under the law, it merely gave the Board the names of seven witnesses. The Regional Director's investigation sufficed to dispose of the objections made, Louis-Allis Company v. NLRB, 463 F.2d 512, 520 (7th Cir. 1972), since no material issues of fact were raised in the testimony of the five witnesses and Lawson which could be resolved only by a hearing. *Id.*

The Regional Director recommended on January 28, 1972 that the objections be overruled. The Respondent did not ask for a hearing until it formally filed exceptions before a panel of the Board. It urged for the first time in the exceptions that the certification be set aside because Lawson's statements raised substantial and material factual issues. It had the burden of showing by specific evidence that the election was unfair. Fones v. NLRB, 431 F.2d 417, 420 (5th Cir. 1970). It filed, in support of its exceptions, an officer's and several employee's affidavits which had not been submitted to the Regional Director. The Board panel on March 10, 1972 adopted the Regional Director's findings and conclusions and recommended the exceptions be overruled and that the Union be certified as bargaining representative. It found that the exceptions "raise[d] no substantial issues of fact or law which would warrant" setting aside the Regional Director's findings and conclusions "or require a hearing." It certified the Union as bargaining representative.

The General Counsel's motion for summary judgment asserted that the Respondent was attempting to relitigate

---

5. The Respondent asserts that the names on their letterhead were product names and not company names. Witness C said he "understood" the names of the supposed unionized plants "to be names of the company products."

before the Board issues already litigated before the Regional Director. This assertion was noted in the Board panel's subsequent order transferring the proceedings to the Board in Washington and issuing a rule for the Respondent to show cause why summary judgment should not be granted.

We disagree with the Respondent that it "supplied" to the Regional Director prima facie evidence of Union misconduct requiring that the election be set aside. The several belated affidavits were not before the Regional Director. Neither have we been shown that those affidavits could not have been obtained before the Regional Director filed his report by a diligent recognition of Respondent's legal burden. Instead the Respondent rested its objection upon the Director's investigation.

We conclude that on the objections made before the Regional Director no hearing was requested and none necessary.

Order enforced.