**HENDERSON TRUMBULL SUPPLY CORPORATION, Petitioner,**

**v.**

**The NATIONAL LABOR RELATIONS BOARD, REGION 2, Respondent.**

**Nos. 699, 878, Dockets 73–2441, 73–2643.**

United States Court of Appeals, Second Circuit.

Argued May 6, 1974.

Decided July 23, 1974.

Dwight F. Fanton, Bridgeport, Conn. (Dion W. Moore, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., of counsel), for petitioner.

John G. Elligers, Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, William Gaus, Atty., N. L. R. B., Washington, D. C., of counsel), for respondent.

Before ANDERSON, FEINBERG and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Henderson Trumbull Supply Corp. (the "Company" herein) seeks review, and the National Labor Relations Board (the "Board" herein) seeks enforcement, of a Board order issued against the Company on August 6, 1973, directing it to bargain collectively in good faith with Local 191, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "Union" herein) as the certified bargaining representative for the Company's employees. Certification was granted on October 31, 1972, based on the Union's narrow victory (by one vote) in an election held on June 14, 1972. Because the Board granted certification and subsequently issued its order without affording the Company an evidentiary hearing on certain objections it raised with respect to the pre-election conduct of the Union, we deny enforcement of the Board's order and remand for an evidentiary hearing on those objections.

The Company is a small retail seller of building materials and home supplies in Trumbull, Connecticut. Upon the Union's filing of a petition with the Board for certification as collective bargaining representative for the Company's employees, an election was held at the Company on June 14, 1972, which the Union won by a vote of 7 to 6 in a unit of only 15 eligible voters, two of whom did not cast ballots. Shortly after the election the Company filed timely objections with the Board, alleging that following the Union's distribution in early June of a letter to the employees stating that the Company "had been making a great deal of money through you and your fellow employees," the Union's Business Agent, two days before the election, had made material misrepresentations of fact to the employees, to which the Company had had no opportunity to respond before the election. Specifically the Company charged that at a meeting of its employees held at the Union's offices on June 12, 1972, the Union's Business Agent, Anthony Rossetti, stated that in the previous year the Company had "made a profit . . . of $1,300,000.-00" and that the Company's Vice-President, Fred Salvati, had "just built a new residence for himself costing $75,000 to $80,000." Both statements, according to the Company, were "absolutely false, un-

true and misleading." During the year prior to the election the Company's [t]otal *gross* sales let alone profit, were "[only] $970,000" [1] (emphasis supplied) and its profit was a much smaller amount.

Pursuant to § 102.69 of the Board's Rules and Regulations, 29 C.F.R. § 102.-69, the Board's Acting Regional Director conducted an independent investigation of the Company's objections. In a report dated August 1, 1972, he found that the Union had held a meeting at its offices in Bridgeport, Connecticut, on the evening of June 12, 1972, which was attended by eight of the Company's employees. During this meeting, after Rossetti had explained the Board's election procedures and urged the employees to vote for the Union, the subject of discussion turned to the Company's ability to pay the employees more money. Rossetti denied that he initiated the discussion concerning Vice-President Salvati's new home or placed any value on it, and the Regional Director found no evidence to contradict him. The Regional Director stated:

> "Seven of the eight attending employees were interviewed by a Board Agent. Five of these employees say flatly that Rossetti did not bring the house into discussion but rather that an employee did. Two do not recall who brought the matter up. All seven agree that Rossetti placed no value on the house."

However, four of the employees interviewed did recall that Rossetti had discussed what the Company had "made" during the previous year:

> "One stated in an affidavit that Rossetti had said the Employer had made 1.3 million dollars. A second employee claimed Rossetti said the Employer had made one million dollars, without identifying the figure as gross, net or profit. This same employee, in a second statement to the

Board agent made two weeks later, revised his original figure and stated that he 'believed' that Rossetti had claimed the Employer made 1.2 or 1.3 million dollars. He would not sign either statement. A third employee recalled that Rossetti had said 'something about the Employer making a million dollars last year and being able to afford to pay us more.' (The employee would not sign a statement.)

> "The fourth of the employees who recalled a specific figure states that during the meeting 'someone,' I believe it was Rossetti, 'said the company grossed at least one million dollars last year' and says also that this statement was made in a context of the Company's ability to pay increases. (This employee signed a statement.)"

The Regional Director found that although the evidence was "somewhat contradictory," it "would support the assertion that some specific figure was stated." Beyond this, however, he apparently did not seek to ascertain the impact of Rossetti's statement by inquiring whether any of the interviewed employees had been influenced by it to vote in favor of the Union. Instead he concluded in effect that Business Agent Rossetti's statements, as interpreted by him, were per se immaterial and hence that the Union's alleged misrepresentation of Company profits was meritless:

> "[T]he evidence does not tend to establish that Rossetti was referring to 'profits' as distinguished from gross income. It is of course arguable that the use of the word 'made' implied a profit but there is enough ambiguity in the term, and so little an exaggeration in the figure, as to preclude a conclusion that a material misrepresentation was made. More importantly, it is clear from the nature of the statement allegedly made by Rossetti, that he was not talking from knowledge, but was expressing an opinion

---

1. At the time it filed its objections the Company's books were in the process of being audited so that no figure for net profits was available. At oral argument the Company represented that its net profits were but a fraction of the $970,000 grossed by it.

or making a guess and this obviously was clear also to the employees he was addressing who were competent to appraise the statement in the light of their own knowledge—or lack of it—concerning the Employer's profits from its operations."

Accordingly, the Regional Director recommended that the Company's objections be overruled and that the Board certify the Union as the exclusive collective bargaining representative of the Company's employees.

The Company filed timely exceptions to the Regional Director's findings, conclusions and recommendations. However, on October 31, 1972, the findings and conclusions were adopted by the full Board which certified the Union as the bargaining representative for the Company's employees. In November 1972, upon the Company's refusal to bargain collectively with the Union over wages, hours and working conditions, the Union filed an unfair labor practice charge with the Board and on December 14, 1972, the Board issued a complaint against the Company. In its answer the Company challenged the validity of the original certification. It also alleged that subsequent events, specifically the termination of 10 out of the 15 employees who had been eligible to vote in the election for theft of the Company's money and materials, made a revocation of certification proper, since there was a strong probability, as a result of the post-election turnover, that only a small fraction of those in the unit, and possibly more, would currently be represented by a bargaining agent of their choice if effect were given to the certification.

On August 6, 1973, the Board, on motion for summary judgment by the Board's General Counsel, held that the Company had violated § 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by refusing to bargain collectively

in good faith with the Union and ordered it to cease and desist from this unfair labor practice and to take affirmative action to carry out its bargaining duties under the Act. Since the order was issued on motion for summary judgment the sole issue we must decide, on the Company's petition to review and set aside and upon the cross-petition of the Board to enforce the order, is whether the Company's objections to the election or exceptions to the Regional Director's Report warranted a hearing. We hold that they did.

### Discussion

The Board first argues that the Company was not entitled to a hearing on the factual statements set forth in its objections since it failed to support them with written affidavits or other independent evidence. While the Board's own rules do not suggest that affidavits or other evidence must be submitted when objections to an election are filed,[2] those rules also state that "[t]he party filing objections shall, *upon request*, promptly furnish to the regional director the evidence available to it to support the objections." (Emphasis supplied). See 29 C.F.R. § 102.-69(a). The Board has presented us with a letter, which its Regional Director sent to the Company shortly after its objections had been filed, containing a request for supporting evidence. There is no indication that the Company ever responded to this letter.

We believe that, while the objections may not have qualified as "evidence" in the strict technical sense of that term, any such formal deficiency should not deprive the Company of a hearing to which it would otherwise have been entitled. The objections were not "nebulous and declamatory assertions, wholly unspecified," see Fay v. Douds, 172 F.2d 720, 725 (2d Cir. 1949), nor based on

2. Section 102.69(a) of the Board's Rules, 29 C.F.R. § 102.69(a), provided only that "any party may file with the regional director an original and three copies of objections to the conduct of the election or conduct affecting the results of the election, which shall contain a short statement of the reasons therefor."

"equivocal hearsay," NLRB v. O.K. Van Storage, Inc., 297 F.2d 74 (5th Cir. 1961), but referred to specific events and listed specific people who were witnesses to these events.[3] See NLRB v. Douglas County Electric Membership Corp., 358 F.2d 125, 129 (5th Cir. 1966). Furthermore, the objections satisfied the underlying purpose of § 102.69(a) by furnishing sufficient factual detail to enable the Regional Director to evaluate them and sufficient identification of witnesses and sources to permit verification by the Director's staff. Under the circumstances, to hold in this case that the objections were insufficient because they were not attested to or verified would be to exalt form over substance. Being signed by the Company's counsel they should be accorded the same weight as would be attributed to a pleading so signed. See Rule 11, F.R.Civ.P. Furthermore, whatever may have been the result if the Regional Director's investigation had failed to uncover specific supporting evidence, any deficiency must be deemed to have been waived or excused when, as here, it uncovers evidence calling for a hearing. See United States Rubber Co. v. NLRB, 373 F.2d 602, 606 (5th Cir. 1967) ("If the investigation itself reveals . . . that material factual issues exist which can be resolved only by a hearing, then a hearing must be held; once the investigator discovers facts by his investigation it becomes immaterial that there was a pre-investigation failure to supply him with specific evidence of what he later discovered."). Otherwise, the "specific evidence" requirement could lead to absurd results and render the Regional Director's independent investigation, which is mandated by the Board's own rules, see 29 C.F.R. § 102.-69(c), a superfluous formality.

■■ The essential question, therefore, is whether, despite the Board's denial of a hearing, the evidence relied upon by the Company, as verified by the Regional Director, entitled it to a hearing. We recognize that "[t]he conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse." NLRB v. Olson Bodies, Inc., 2 Cir., 420 F.2d 1187, 1189 (1970), cert. denied, 401 U.S. 954, 91 S. Ct. 966, 28 L.Ed.2d 237 (1971). The Board has been entrusted with broad discretion in determining the nature and extent of pre-election propaganda that will be allowed, NLRB v. Millard Metal Service Center, Inc., 472 F.2d 647, 650 (1st Cir. 1973); NLRB v. Sauk Valley Mfg. Co., 486 F.2d 1127 (9th Cir. 1973); Follett Corp. v. NLRB, 397 F.2d 91, 94 (7th Cir. 1968), and it has prided itself on its toleration of "intemperate, abusive and inaccurate statements" made by the Union during attempts to organize employees. Linn v. Plant Guard Workers, 383 U.S. 53, 61, 86 S.Ct. 657, 15 L. Ed.2d 582 (1966); Modine Mfg. Co., 203 N.L.R.B. No. 77, 83 L.R.R.M. 1133 (1973), application for enforcement pending, 8th Cir., No. 73-1664; Hollywood Ceramics Co., Inc., 140 N.L.R.B. 221, 224 (1962); Stewart-Warner Corp., 102 N.L.R.B. 1153, 1158 (1953). Considerable deference must furthermore be given to the expertise of the Board in this area, and to the findings of its Regional Director. Undue appellate interference could threaten the essential functioning of a system that has, according to well-settled standards, governed the conduct of some 9,000 elections annually.

■■ For these reasons the burden upon the party seeking a hearing is a weighty one. See Bausch & Lomb, Inc. v. NLRB, 404 F.2d 1222, 1226 (2d Cir. 1968). It must demonstrate by "specific evidence" that a "substantial and material factual issue" exists with respect to the employees' exercise of a free choice, which could well have affected the elec-

3. In both its objections and exceptions the Company listed the names of persons who were witnesses to the alleged statements by Rossetti.

tion results. Of necessity the existence of such an issue depends greatly upon the nature of the misrepresentation relied upon by the challenging party and upon the surrounding circumstances. Among the factors to be considered besides the materiality of the factual misrepresentation itself are (1) the influence that it might reasonably have had upon the employees, (2) the extent to which the declarant could reasonably be viewed by the employees as a person in a position to know the facts, (3) the opportunity for reply, and (4) the ability of the employees to evaluate the statement on the basis of their own independent knowledge of the facts. NLRB v. Cactus Drilling Corporation, 455 F.2d 871 (5th Cir. 1972); NLRB v. Millard Metal Service Center, Inc., *supra*; Hollywood Ceramics Co., Inc., *supra*. In the present case the Board does not seriously dispute the fact that since Rossetti's statement to the employees was made virtually on the eve of election there was an inadequate opportunity for reply. However, the Regional Director took the view that none of the other prerequisites was satisfied. He concluded that in referring to the specific dollar amount "made" by the Company during the previous year (1) the Union Business Agent was not describing "profits" as distinguished from "gross income," (2) "he was not talking from knowledge, but was expressing an opinion or making a guess," and (3) the employees "were competent to appraise the statement in the light of their own knowledge—or lack of it—concerning the Employer's profit from its operations." We disagree. In the absence of a hearing we are at a loss to comprehend how the Regional Director could have arrived at

these conclusions. Cf. NLRB v. Janler Plastic Mold Corp., 82 L.R.R.M. 2175, 2178 (7th Cir. 1972).

In our view a statement that the Company had "made" $1.3 million in the previous year would clearly imply to the average non-accountant (and we can assume that a millhand with training in accountancy would be a rarity) that the Company had "gained" or "profited" by that amount. Indeed, we suspect that this same meaning would be attributed to the word "made" by some accountants. Use of the term "grossed" instead of "made" would have alerted the listener to the fact that the Union was referring to receipts, not profits, and would not have called for a hearing. See, e. g., NLRB v. Louisville Chair Co., 385 F.2d 922 (6th Cir. 1967). But, absent a hearing, we cannot agree that the statement that the Company had "made" $1.3 million during the previous year was not materially misleading.[4]

Nor can we agree with the Regional Director and Board that it must have been clear to the employees that the Union Business Agent, in stating that the Company had made $1.3 million, was merely "expressing an opinion or making a guess." In most local unions the business agent, who may be the only full-time union employee, "has the greatest power and most important functions in the local union, frequently more important than the local's president who may be a mere figurehead," Kheel, I Labor Law § 3.03 [2], pp. 3–17 (Matthew Bender, 1972). His function, which is to organize and serve as liaison with management, requires him to learn as much as possible about the financial condition of the employer with whom he negotiates on behalf of its employees. His

4. Our dissenting colleague, Judge Feinberg, emphasizes that the "Acting Regional Director extensively investigated the [Company's] objections of the election," conducting "interviews with seven of the eight employees present at the meeting where union business agent Rossetti allegedly stated that the Company 'made' $1.3 million in 1971." However, it is extraordinary that, although at least three of the seven employees quoted Rossetti as stating that the Company had "'made' $1.3 million in 1971," a term considered ambiguous by the Director and by our Colleague, the Director apparently did not bother, despite the closeness of the 7 to 6 vote in favor of the Union, to ask them the obviously crucial question: "What did you understand to be the meaning of the term 'made'?"

position, coupled with his mention of a specific profit figure, could reasonably have led the employees to believe that he had ferreted out the information from financial books or records available to the Union through its bank or other sources or from initial conferences with Company officers. Nothing in the Regional Director's Report supports the view that the employees believed otherwise.

We likewise cannot agree with the Regional Director's conclusion that the employees were competent to appraise the Business Agent's specific figure in the light of their own knowledge of the Company's profit from its operations. Without casting any reflections upon the employees, who are "drivers, yardmen, fork-lift operators, millmen, store salesmen and stock clerks," it strikes us as unreasonable to expect that they, with the possible exception of a store salesman, would have any knowledge as to the Company's profits, much less access to such information. A person performing essentially manual labor within a limited sphere, such as a driver or millman, would normally have no exposure to his employer's receipts, much less to its profits. Furthermore, it is irrelevant that the employees addressed by Rossetti could have conducted their own investigation into the truth or falsity of his representations. "[T]o excuse a flat misrepresentation on the ground that the deceived party, having no reason to do so, could have investigated and learned the truth, is contrary to both legal and ethical principles." See NLRB v. Millard Metal Service Center, Inc., 472 F.2d 647 (1st Cir. 1973); Cross Baking Co. v. NLRB, 453 F.2d 1346, 1349 (1st Cir. 1971).

■ In sum, we hold that the evidence in this case as to the misrepresentation of the Company's profits raised a "substantial and material factual issue" as to the employees' exercise of a free choice. It supports the charge that a person apparently in a position to know the facts had misrepresented a material fact (i. e., the amount of money available for increase in employees' wages and benefits) in a manner and at a time which deprived the Company of an opportunity to respond.[5] This claim, together with the written statements obtained by the Regional Director himself, prima facie warranted setting aside the election which the Union won by only one vote. NLRB v. Bata Shoe Co., 377 F.2d 821 (4th Cir. 1967), cert. denied, 389 U.S. 917, 88 S.Ct. 772, 19 L.Ed.2d 825 (1968). Where, as here, an election is extremely close, even minor misconduct cannot be summarily excused on the ground that it could not have influenced the election. See NLRB v. Skelly Oil Co., 473 F.2d 1079, 1085 (8th Cir. 1973); NLRB v. Gooch Packing Co., 457 F.2d 361, 362 (5th Cir. 1972). In this case, absent a hearing, there was no justification for the Regional Director or the Board to assume that the employees must have interpreted the alleged statement by Rossetti as a reference to "gross" revenue or as an uninformed guess. Indeed the reasonably probable interpretations were precisely the opposite.

We agree with the Board that the Company's allegation that Rossetti had told the employees that the Company's Vice-President had purchased a new home worth between $75,000 and $80,000 did not by itself necessitate a hearing in light of the results of the Regional Director's investigation into this charge. However, since a hearing is necessary with respect to the alleged misrepresentation of Company profits, we direct that the second allegation also be taken up at that hearing. The Company's objection based on the subsequent discharge of 10 out of the 15 employees who had been eligible to vote in the election could not in any event provide a basis for setting aside the election, since it could not be sustained without destroy-

5. The Company alleged that it had not learned of Rossetti's statements until after the election.

ing "the finality sought to be given to Board-conducted elections." See *Orleans Storage Company, Inc.*, 123 N.L.R.B. 1757, 1758 (1959). Cf. *Brooks v. NLRB*, 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125 (1959). Accordingly, that issue need not be heard.

Remanded for further proceedings not inconsistent with this opinion.

FEINBERG, Circuit Judge (dissenting):

This case is a good example of judicial interference with a process which performs best with a minimum of regulation, particularly by judges. The majority has fallen into two errors which courts reviewing administrative decisions concerning the conduct of representation elections should be careful to avoid. The first is to substitute too readily judicial judgment of the likely effect of campaign propaganda for that of the Board and the Regional Director. The second is to forget that a representation election, like any experiment in democracy, is conducted in the hurly-burly of the real world, where puffing, ambiguity and rhetoric occur as part of the election process and are routinely discounted. Because the majority opinion unnecessarily undermines the finality of representation elections and is based upon unrealistic assumptions regarding the effect of a single oral statement by a union organizer, I dissent and would grant the Board's cross-application for enforcement of its order.

The Acting Regional Director extensively investigated the objections to the election by petitioner Henderson Trumbull Supply Corporation (the Company). Thus, there were interviews with seven of the eight employees present at the meeting where union business agent Rossetti allegedly stated that the Company "made" $1.3 million in 1971. In addition, the Company was afforded an opportunity to submit evidence of its own, but failed to do so. On the basis of this investigation, the Regional Director found:

The evidence [relating to the alleged statement] is somewhat contradictory although the weight thereof would support the assertion that some specific figure was stated. In any event the evidence does not tend to establish that Rossetti was referring to "profits" as distinguished from gross income. It of course is arguable that the use of the word "made" implied a profit but there is enough ambiguity in the term, and so little an exaggeration in the figure, as to preclude a conclusion that a material misrepresentation was made. More importantly, it is clear from the nature of the statement allegedly made by Rossetti, that he was not talking from knowledge, but was expressing an opinion or making a guess and this obviously was clear also to the employees he was addressing who were competent to appraise the statement in the light of their own knowledge—or lack of it—concerning the Employer's profits from its operations.

The Board adopted the Regional Director's findings and conclusions, and certified the Union as the bargaining representative of the Company's employees.

On this appeal, the majority recognizes that "[t]he conduct of representation elections is the very archetype of a purely administrative function with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse." *Quoting NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971). Consequently, a party seeking a court-ordered evidentiary hearing bears the heavy burden of demonstrating by "specific evidence" that a "substantial and material factual issue" exists whether the alleged misconduct "could well have affected the election results." Unaccountably, the majority proceeds to ignore these sound principles. On the basis chiefly of its own speculations concerning the probable reactions of the employees, the majority sets aside the conclusions of the Board

and the Regional Director and remands for a hearing. The justifications offered for this drastic action are, I submit, inadequate.

The majority first reasons that Rossetti's alleged statement that the Company "made" $1.3 million would mean to the average employee that the company had realized a profit of that amount. But the Company offered no evidence that any employee so understood the statement and the Regional Director apparently detected no such understanding during his interviews with the employees. To be sure, the alleged statement is ambiguous in that it could refer either to net profits or gross receipts. However, this ambiguity is itself a strong reason for concluding with the Board and the Regional Director that the alleged statement was not likely to have had an impact upon the election. See Harlan # 4 Coal Co. v. NLRB, 490 F.2d 117, 124 (6th Cir.), cert. denied, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). To the extent that employees perceive the ambiguity, an unclear statement conveys its own warning that it is not to be relied upon without further inquiry. And, even accepting arguendo the majority's improbable view that the employees here had scant knowledge of the Company's business operations, it seems quite likely that they were aware of the difference between gross income and net profit and realized that the phrase "made $1.3 million" could describe either.

The majority then determines that the employees may well have believed that Rossetti had special knowledge of the Company's financial situation and that he had used his position as union business agent to ferret out information concerning the Company's affairs. Of course, it is conceivable that the employees thought this. But there is no suggestion that Rossetti expressly represented that he had special knowledge. And, if the employees really believed he had such knowledge, it is difficult to see why this belief would not have become apparent in the course of the Regional Director's interviews. Yet the Regional Director concluded, after questioning the employees as to what had been said and under what circumstances, that it was obvious to all that Rossetti "was expressing an opinion or making a guess." This being so, I cannot characterize the failure to hold an evidentiary hearing here as a "glaring discrimination or abuse."

The majority next rejects the Regional Director's conclusion that the employees were capable of appraising Rossetti's statement in light of their own knowledge of the Company's financial situation. This, says the majority, was largely a unit of manual laborers and such workers are not likely to have much exposure to their employer's receipts, much less its profits. Of course, these employees are probably unaware of the precise figures on the corporate balance sheet. But even such workers must have some familiarity with the order of magnitude of their employer's operations. And Rossetti allegedly estimated profits at $1.3 million, substantially larger than actual gross receipts and perhaps ten to 20 times greater than the Company's actual profits. It strains credulity to argue that workers at a small New England lumber company employing just 15 full and part-time production workers and salesmen would unquestioningly accept such a surprisingly large estimate of profits. In any event, it seems to me that the level of employee financial sophistication is a matter "peculiarly within the ken of the Board's local representatives who are close to the scene . . . ." Cf. NLRB v. Bayliss Trucking Corp., 432 F.2d 1025, 1029–1030 (2d Cir. 1970).

Finally, the majority holds that the alleged misrepresentation of the Company's profits raises a "substantial and material factual issue" as to the employees' exercise of free choice. But the employees' vague recollection of what Rossetti said at the meeting belies this conclusion. See NLRB v. Visual Educom, Inc., 486 F.2d 639, 642–643 (7th Cir. 1973) (alleged misrepresentation

not basis for requiring evidentiary hearing despite 57–55 vote because recollections of witnesses so vague that Regional Director, even without hearing, could reasonably conclude that statement had little impact on election). Accepting arguendo the majority's scenario that the employees were informed by a source they believed to have special knowledge that their employer was making huge profits in which they were not sharing, we would expect Rossetti's remarks to be etched indelibly on the employees' minds. Yet this was not the case. Three of the seven employees interviewed did not recall Rossetti's making any estimate of corporate income, gross or net. A fourth remembered a $1 million figure but stated that Rossetti referred specifically to gross income. A fifth recollected only that Rossetti had said "something about the Employer making a million dollars last year . . . . ." The other two employees recalled that Rossetti had observed that the Company "made" $1.3 million without identifying the figure as gross, net or profit, but apparently even these employees did not indicate to the Regional Director that they understood Rossetti to be referring to profits. In view of the employees' own responses, then, I cannot see the necessity for an evidentiary hearing to probe the impact of the alleged misrepresentation upon the election.[1]

Of course, we would all feel somewhat better if Rossetti had referred specifically to gross receipts, eliminating all possibility of confusion. But he did not do so; union organizers on the stump, under the pressures of time, election fervor and strongly held economic views, characteristically do not choose their words with the care of judges in their chambers. Moreover, recent research studies indicate that campaign propaganda has little effect upon election results; according to the admittedly tentative conclusions of these studies, a worker's vote for or against collective representation .is determined largely by his general satisfaction with his job and by his prior experiences with and general attitudes toward unions. See Brotslaw, Attitude of Retail Workers Toward Union Organization, 18 Lab.L.J. 149, 168–71 (1967); Getman & Goldberg, The Myth of Labor Board Expertise, 39 U. Chi.L.Rev. 681, 696 (1972); Getman, Goldberg & Herman, The National Labor Relations Board Voting Study: A Preliminary Report, 1 Journal of Legal Studies 233 (1972). Given the practical difficulties of preventing ambiguous statements such as Rossetti allegedly made and the strong possibility that little is gained by preventing them, it is worth emphasizing that a goal of the election process should be to give speedy practical effect to the choice of employees for or against collective representation. See Samoff, NLRB Elections: Uncertainty and Certainty, 117 U.Pa.L.Rev. 228 (1968). The union or non-union status of a proposed bargaining unit should not be subjected to protracted litigation before the Board and in the courts because of a single oral statement, made in the give-and-take of an organizational meeting, apparently not deliberately false, and misleading only when one postulates a very low level of employee economic sophistication. This decision will only encourage losing

---

1. The majority puts some emphasis on the fact that the union won this election by a vote of 7–6, arguing that where an election is extremely close, "even minor misconduct cannot be summarily excused on the ground that it could not have influenced the election." But such a rule would make it difficult to hold a conclusive election in a small unit such as this one (15 eligible voters) where a decision by one, two or three votes is always a good possibility. More importantly, the courts have not found it necessary to order evidentiary hearings even in very close elections where the Regional Director has conducted a thorough administrative investigation and where his decision not to hold a hearing was not a "glaring discrimination or abuse." See, e. g., NLRB v. Olson Bodies, Inc., supra, 420 F.2d at 1189 (no hearing ordered despite 110–109 vote in election); NLRB v. Visual Educom, Inc., supra, 486 F.2d at 643 (no hearing despite 57–55 vote); NLRB v. Georgia-Pacific Corp., 473 F.2d 206 (8th Cir. 1973) (no hearing despite 77–75 vote).

parties, employers and unions, to raise objections to election results and further burden the Board, which already has to process over 1,000 such objections annually. Thirty-Seventh Annual Report of the NLRB at 244–45 (1972).

I see no merit in the Company's other arguments.

I would deny the Company's petition for review and grant the Board's cross-application for enforcement of its order.